*1223-15*

**ORIGINAL**

Oral argument requested

PD-1223-15

IN THE TEXAS COURT OF CRIMINAL APPEALS
AT AUSTIN, TEXAS

*******************************************

**LEONARDO RIVAS**
Appellant-Petitioner

**V.**

**THE STATE OF TEXAS**
Appellee-Respondent

*******************************************

FROM THE FOURTH COURT OF APPEALS
CAUSE NO. 04-14-00180-CR

APPEAL FROM THE 38TH JUDICIAL DISTRICT COURT
OF MEDINA COUNTY, TEXAS, CAUSE NO. 12-04-10954-CR
THE HONORABLE CAMILE G. DUBOSE PRESIDING

*******************************************

**APPELLANT'S PETITION FOR DISCRETIONARY REVIEW**

*******************************************

By:
**Leonardo Rivas, Pro Se**
Medina County Jail
801 Ave. Y
Hondo, Texas 78861

RECEIVED IN
COURT OF CRIMINAL APPEALS

OCT 29 2015

Abel Acosta, Clerk

FILED IN
COURT OF CRIMINAL APPEALS

OCT 29 2015

Abel Acosta, Clerk

## ISSUE PRESENTED

Whether, for purposes of determining whether an appellant was harmed from a trial court's error in denying a sudden passion instruction, sufficient evidence contradicting a self-defense claim is sufficient to establish the absence of harm when the jury could have rejected appellant's self-defense claim because appellant was unlawfully carrying a handgun in the motor vehicle from which he fired shots that killed the complainant that appellant claimed was stabbing him at window of vehicle.

# TABLE OF CONTENTS

ISSUE PRESENTED................................................ii

TABLE OF CONTENTS.............................................iii

INDEX OF AUTHORITIES..........................................iv

IDENTITY OF JUDGE, PARTIES, AND COUNSEL.......................v

STATEMENT REGARDING ORAL ARGUMENT............................vi

STATEMENT OF THE CASE........................................vi

STATEMENT OF PROCEDURAL HISTORY..............................vi

INTRODUCTION...................................................1

ARGUMENT

      For the purpose of determining whether an appellant was harmed from
      a trial court's error in denying a sudden passion instruction,
      sufficient evidence contradicting a self-defense claim is not
      sufficient to establish the absence of harm when the jury could have
      rejected appellant's self-defense claim because appellant was
      unlawfully carrying a handgun in the motor vehicle from which he
      fired shots that killed the complainant that appellant claimed was
      stabbing him at window of vehicle....................................4

PRAYER.........................................................6

DECLARATION....................................................6

CERTIFICATE OF SERVICE.........................................7

APPENDIX:  Fourth Court of Appeals Opinion

# INDEX OF AUTHORITIES

**Case**                                                                 **Page**

Trevino v. State, 100 S.W.3d 232, 242 (Tex.Crim.App.2000)...................6

**State Statutes**

Tex.Pen.Code § 9.31(b)(5)(A)..............................................3

Tex.Pen.Code § 9.31(b)(5)(B)..............................................3

Tex.Pen.Code § 46.02(a)(Old Law).........................................3

Tex.Pen.Code § 46.02(a-1)(1)..............................................3

Tex.Pen.Code § 46.02(a-1)(2)(A)...........................................3

Tex.Pen.Code § 46.02(a-1)(2)(B)...........................................3

Tex.Pen.Code § 46.02(a-1)(2)(C)...........................................3

Tex.Pen.Code § 46.05.....................................................3

Tex.Civ.Prac. & Rem.Code Ch. 132.........................................6

**Federal Statutes**

28 U.S.C. § 1746.........................................................6

**State Rules**

Tex.R.App.P. 66.3(b).....................................................1

## IDENTITY OF JUDGE, PARTIES, AND COUNSEL

Appellant:
Mr. Leonardo Rivas
Medina County Jail
801 Ave. Y
Hondo, Texas 78861

Appellant's Trial Attorney:
Mr. Humberto Saldana
Bar. No. 24026460
719 S. Flores Street
San Antonio, Texas 78204-1350

Appellant's Appeal Attorney:
Ms. Dayna L. Jones
Bar No. 24049450
Law Office of Dayna L. Jones
206 E. Locust Street
San Antonio, Texas 78212

Trial Judge:
Hon. Camile G. Dubose
38th District Court
Presiding Judge
1100 16th Street
Hondo, Texas 78861

State's Trial Attorneys:
Mr. Daniel J. Kindred
38th Judicial District Attorney
Bar No. 24010682
Ms. Christina Busbee
Assistant District Attorney
Bar No. 00797819
3102 Ave. G
Hondo, Texas 78861
Mr. Mark D. Kimball
Regional 2 Counsel
Bar No. 11418030
1901 Bob Bullock Loop
Laredo, Texas 78043

State Appeal Attorneys:
Mr. Daniel J. Kindred
38th Judicial District Attorney
Bar No. 24010682
Ms. Christina Busbee
Assistant District Attorney
Bar No. 00797819
3102 Ave. G.
Hondo, Texas 78861

## STATEMENT REGARDING ORAL ARGUMENT

This case raises important issues about appellate courts' review of claims of error and harm analysis, and the intertwining nature of self-defense and sudden passion jury instruction. Leonardo believes oral argument would be helpful to this Court to understanding these issues, so oral argument is therefore requested.

## STATEMENT OF THE CASE

Petitioner Leonardo Rivas was tried with his brother, Michael Rivas, for the offenses of Murder, Aggravated Assault with a Deadly Weapon and Conspiracy to Commit Murder. The jury found Leonardo guilty on all counts and assessed punishment at life for the murder charge, 20 years for the aggravated assault charge, and 20 years for the conspiracy charge. (10 RR 37-38.) Leonardo appealed and the Fourth Court of Appeals affirmed. (Attached Appendix, Court's Op.) He now seeks discretionary review of one of the four claims raised on appeal.

## STATEMENT OF PROCEDURAL HISTORY

The court of appeals handed down its opinion on August 19, 2015. Leonardo Rivas v. State of Texas, No. 04-14-00180-CR (Tex.App.—San Antonio). Leonardo did not file a motion for rehearing. This Court granted Leonardo an extension of time to file this Petition. This Petition is due by November 17, 2015.

TEXAS COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

LEONARDO RIVAS,                           §                    CCA# PD-1076-14
                                          §
          Appellant,                      §
                                          §
     V.                                   §                    COA# 04-14-00180-CR
                                          §
STATE OF TEXAS,                           §
                                          §
          Appellee.                       §                    TC# 12-04-10954-CR

## APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

### INTRODUCTION

The court of appeals has decided an important question of state law that has not been, but should be, settled by this Court. Tex.R.App.P. 66.3(b). Specifically, the court concluded that in a case where the jury could have rejected an appellant's self-defense claim because the appellant was not entitled to presumption of self-defense because he was unlawfully carrying a handgun in the motor vehicle from which he fired shots that killed the complainant that appellant claimed was stabbing him at window of vehicle, "the evidence contradicting [the appellant's] claim of self-defense is ... sufficient to establish the absence of harm from the denial of a sudden passion instruction." (Court's Op. p. 11.) It is that conclusion that Petitioner Leonardo Rivas seeks discretionary review of.

### STATEMENT OF THE FACTS

At least 10-12 members of the Mexican Mafia attacked Appellant Leonardo Rivas's brother Michael Rivas at about 1:00 a.m. at a park on 18th Street in Hondo, Texas, beating him and stabbing him. (8 RR 107-08; 7 RR 122-23; 7 RR 16, 44, 47, 52, 230.) Michael and his girlfriend Adriana went to the park to speak with Eusebio "Chevio" Luna because Chevio wanted to talk to Michael about $300 worth of cocaine he believed Adriana stole from him. (7 RR 10, 222.)

1

Chevio was a member of the Mexican Mafia. (6 RR 194.) Michael was an ex-member of the Mexican Mafia. (7 RR 215-16, 218.) After Michael refused Chevio's order to kill Adriana, Chevio made a hand signal and the other men attacked Michael. (8 RR 16-17, 23-24.) Michael left running, and Adriana picked him up down the street. (7 RR 17, 44.) Deceased complainant "Chape" was one of the men that attacked Michael. (See e.g. 7 RR 16.) About 30 minutes later Michael, Leonardo, and Adriana pulled up to the stop sign in front of Chape's brother's mobile home in Adriana's parents' Expidition. (4 RR 36.) That's when Leonardo shot Chape and his brother Johnny Joe. (4 RR 38, 42, 44.) Johnny Joe was shot once in the leg and lived, but Chape was shot several times and died. (4 RR 10, 12, 27, 52, 42, 44.)

Leonardo and Michael testified that Chape attacked Leonardo at the passenger window of the Expidition stabbing him. (See e.g. 7 RR 237; 8 RR 51-52.) Leonardo testified that he grabbed the gun from the console and fired several shots at Chape. (8 RR 52-53.) Leonardo testified that he was "scared" and "panicked" because he was afraid Chape was going to kill him. (8 RR 52.)

The Flores family (Chape's family) testified that Chape did not attack Leonardo with a weapon or his fists. (See e.g. 4 RR 118, 169.) Adriana initially told police that Chape attacked and stabbed Leonardo, but at trial, she claimed she lied on that statement and that Chape did not attack or stab Leonardo. (See e.g. 7 RR 60-61; compare with 7 RR 30-31, 51.) Testimony was also conflicting about what transpired after the attack at the park and what was said by Michael and Leonardo before the shooting.

Two things were clear though—Leonardo lived right down the street from Johnny Joe's mobile home and the Expidition was headed in that direction. (4 RR 129.) No one testified that Michael, Leonardo, or Adriana knew where

2

Johnny Joe lived. (See e.g. 4 RR 34, 99, 216.) Leonardo testified that he was trying to get Michael to go to Leonardo's house so he could clean him up. (8 RR 50.)

The jury was charged on the law of self-defense in pertinent part as follows:

The use of force against another is not justified:

. . .

(3) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was

(A) carrying a weapon in violation of Section 46.02; or

(B) possessing or transporting a weapon in violation of Section 46.05.

. . . .

Under 46.02 of the Texas Penal Code, a person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his person a handgun, or carries a handgun in a motor vehicle that is owned by the person or under the person's control at anytime in which:

(1) the handgun is in plain view; or

(2) the person is:

(A) engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic or boating; or

(B) prohibited by law from possessing a firearm; or

(C) a member of a criminal street gang.

(2 CR 493-509); Tex.Pen.Code § 9.31(b)(5)(A), (B); Tex.Pen.Code § 46.02(a) (Old Law); Tex.Pen.Code § 46.02(a-1)(1), (2), (A), (B), (C).

Officer Brian Valenzuela testified that the manner in which Leonardo carried the handgun would be unlawful:

Q. Now Sergeant Valenzuela, if you had seen -- just let me ask you. If you were on patrol and you stop a vehicle with a handgun in a

3

passenger seat in open view, plain view anywhere in the vehicle, what would you do?

A.   If I pull over the vehicle and there was a handgun in plain view, depending on the circumstances, you know, if it was just in plain view, you know basically, we have, depending on the circumstances, unlawful carrying.

....

Q.   If you saw the handgun being displayed outside the window, what would you do.

A.   Unlawful carrying of a weapon.   (6 RR 25.)

At the punishment phase of the trial, Leonardo requested a sudden passion instruction, but the trial court denied that request.   (10 RR 3.)

## ARGUMENT

For purposes of determining whether an appellant was harmed from a trial court's error in denying a sudden passion instruction, sufficient evidence contradicting a self-defense claim is not sufficient to establish the absence of harm when the jury could have rejected appellant's self-defense claim because appellant was unlawfully carrying a handgun in the motor vehicle from which he fired shots that killed the complainant that appellant claimed was stabbing him at window of vehicle.

Leonardo and Michael both testified that deceased complainant attacked Leonardo at the passenger window of the Expidition.   (7 RR 237; 8 RR 51-52.) Leonardo testified that complainant was stabbing him.   (8 RR 51-52.)   Michael testified that he saw something in complainant's hand while complainant was attacking his brother.   (7 RR 239.)   Both Leonardo and Michael testified that they "panicked."   (7 RR 239; 8 RR 52.)   Leonardo testified that he was "scared" and "panicked" because he was afraid complainant was going to kill him.   (8 RR 52.)   In her initial statement, Adriana stated that complainant stabbed Leonardo at the window.   (7 RR 60-61.)

The court of appeals did not decide whether or not the trial court erred in denying Leonardo's request for a sudden passion instruction.   Instead, the court assumed "that the evidence was sufficient to at least minimally support

4

an inference that Leonardo acted under the immediate influence of sudden passion arising from an adequate cause" (Court's Op. at 9). Nevertheless, the court concluded that "the denial of a jury instruction on sudden passion did not harm Leonardo." (Court's Op. at 9.) In its reasoning the court erred in its application of this Court's precedents by conflating the standards of determining whether a trial court errs in not giving the sudden passion instruction and whether such an error actually harmed the appellant. (See Court's Op. at 7-11.) This conflation is significant and should be corrected by this Court because it takes the focus off the dispositive issue of whether or not the appellant was harmed by the denial of the instruction.

In his appeal brief, Leonardo argued that the denial of the instruction harmed him because the jury could have rejected his self-defense claim because he was not entitled to the presumption of self-defense because he was unlawfully carrying the handgun in that vehicle. (See Brief for Appellant, p. 19.) The court of appeals did not address this argument. Leonardo made a valid point, and the court of appeals did not make any specific findings on this point.

Instead, the court of appeals pointed out the evidence contradicting Leonardo's claim of self-defense and concluded that "the evidence contradicting Leonardo's claim of self-defense is also sufficient to establish the absence of harm from the denial of a sudden passion instruction." (Court's Op. at 11 (citations omitted).) This was error.

When, as here, the jury could have rejected an appellant's self-defense claim because the appellant was unlawfully carrying a handgun in a motor vehicle from which he fired shots that killed the complainant that appellant claimed was stabbing him at window of vehicle, sufficient evidence contradicting a self-defense claim is not sufficient to establish the absence of harm

5

from the denial of a sudden passion instruction. "[W]hen a defendant properly objected to the charge, the applicable statutory standard is whether 'the error appearing from the record was calculated to injure the rights of the defendant,' or in other words, whether there was 'some harm.'" Trevino v. State, 100 S.W.3d 232, 242 (Tex.Crim.App.2000). Leonardo has met this standard.

## PRAYER

For these reasons, Appellant Leonardo Rivas respectfully asks this Court to grant this Petition, reverse the judgment of the San Antonio Court of Appeals, and remand this case to the trial court with instructions to conduct a new punishment hearing with a sudden passion instruction.

SUBMITTED and SUBSCRIBED on this the **19** day of **October**, 2015.

Respectfully submitted,

Leonardo Rivas, Pro Se
Medina County Jail
801 Ave. Y
Hondo, Texas 78861

## DECLARATION

"I, Leonardo Rivas, DOB: 12-09-85, presently incarcerated in the Medina County Jail in Medina County, Texas, declare under penalty of perjury under Chapter 132 of the Texas Civil Practice and Remedies Code and 28 U.S.C. § 1746 that the statements given in this Petition for Discretionary Review are true and correct and that I placed this Petition in the Medina County Jail mailing system on this day in a postpaid package.

"Executed on this the **19TH** day of **October**, 2015."

Leonardo Rivas

MARY GRACE PEREZ
Notary Public
State of Texas
My Comm. Exp. 08-01-2018

6

## CERTIFICATE OF SERVICE

I certify that on this the 19th day of October, 2015, I served the State of Texas with a true and correct copy of this Petition for Discretionary Review by U.S. mail through the Medina County Jail mailing system in a postpaid package, addressed to:

    38th Judicial District Attorney
    Medina County, Texas
    3102 Avenue G
    Hondo, Texas 78861

    State Prosecuting Attorney
    P.O. Box 13046
    Capitol Station
    Austin, Texas 78711

_Leonardo Rivas_
Leonardo Rivas

MARY GRACE PEREZ
Notary Public
State of Texas
My Comm. Exp. 08-01-2018

7

APPENDIX

Fourth Court of Appeals' Opinion



# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-14-00180-CR

Leonardo **RIVAS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 38th Judicial District Court, Medina County, Texas
Trial Court No. 12-04-10954-CR
The Honorable Camile G. Dubose, Judge Presiding

Opinion by:   Rebeca C. Martinez, Justice

Sitting:   Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  August 19, 2015

AFFIRMED

Leonardo Rivas appeals his convictions for the murder of Felix Flores and for conspiracy to commit Flores' murder. He does not challenge his conviction for aggravated assault with a deadly weapon against a bystander. We overrule Leonardo's issues on appeal and affirm the trial court's judgments.

## BACKGROUND

On the night of October 14, 2011, Leonardo Rivas, also known as "Lenny," was at a party on Cedar Street in Hondo, Texas, along with his brother, Michael Rivas, and Adriana Benavides.

During the party, Michael received a message that Eusebio "Chevio" Luna, a member of the Mexican Mafia, wanted to meet with him about some cocaine that he believed was stolen by Adriana.[1] Michael and Adriana left the party and drove to a house on 18th Street where Michael met with Chevio in front of the house. During their discussion, Felix Flores, the murder victim, drove up in a white van. Michael testified that Chevio instructed him to kill Adriana and when Michael refused, Chevio made a hand gesture to Felix and several other men who then began attacking Michael. Adriana testified that Felix had something in his hands which she could not see, but assumed was a knife, and he went toward Michael's neck with it; she saw some bleeding afterward, but it was "not that bad." Adriana admitted lying to the police when she said Michael was stabbed in other places too. Michael testified that he was stabbed three times during the fight, at least once by Felix; he stated he was stabbed in the neck, chest, and back of the neck. Michael was able to knock Felix down and run down the street where Adriana picked him up in her parents' black Expedition. The severity of Michael's injuries was the subject of conflicting testimony, but it is undisputed that he did not seek medical attention.

Michael and Adriana returned to the Cedar Street party, and Michael told Leonardo that he had been stabbed. Leonardo testified Michael was bleeding on his neck and chest and was "scared." Michael told Leonardo, "they got me." Leonardo testified he argued with Michael, trying to convince him to go to the hospital or their sister's house to get his injuries treated; Michael refused, saying "they would come get him." Adriana stated that Michael was pacing back and forth and was mad; she stated Leonardo also sounded mad. After some discussion between the brothers, they got back in the Expedition with Adriana. Michael was driving, Leonardo was in the front passenger seat, and Adriana was in the rear passenger seat. There was conflicting testimony

---

[1] Michael Rivas admitted being a Mexican Mafia member, but stated he was "put down" or "kicked out" in 2010.

about whether they were going to get Michael's injuries "cleaned up" as Leonardo stated he wanted to do, were going "cruising" as Michael testified, or were going to find Felix. Adriana testified that she heard Leonardo say he "knew where Felix would be." Leonardo, however, testified that he did not know it was Felix who stabbed his brother, and did not know where Felix lived. Adriana testified that Leonardo retrieved his gun before they left the party. Leonardo testified he always carries a gun because he has been attacked in the past. Adriana stated she heard "clicking noises" coming from the gun before they left the party. Adriana stated she also heard Leonardo tell Michael, "I'm going to make you a believer" when they were driving toward 12th Street.[2]

At approximately 1:15 a.m., Felix Flores was at his brother Johnny Joe Flores' house on 12th Street, where they were drinking beer and eating tacos around a cement slab in front of the mobile home; the cement slab was about eleven feet from the property line. Also present were Johnny Joe's wife, Margie Gonzales, their sons and grandchildren, and Felix's girlfriend Janie Aguilar. Felix told them he had been "jumped" by Michael Rivas, also known as "Mikeo," and they observed a bump above Felix's eye. After about ten minutes, a black Expedition drove up and stopped in front of the Flores yard, close to the property line and about three to four feet short of the stop sign. Johnny Joe heard a male voice from inside the vehicle say, "Yeah, that's him," and Felix said, "That's them . . . Mikeo and Lenny." Margie testified the male voice inside the Expedition said, "There he is" before the vehicle came to a stop. Felix raised his hands up and yelled something in Spanish; Johnny Joe and Margie testified Felix yelled, "what's up" in Spanish. Margie stated she heard the male voice from the vehicle say, "you mother f**ker."

---

[2] As they drove down 11th Street, they saw a policeman and Michael pulled into a driveway and Adriana went to the front door as if she were visiting a friend. Michael admitted they were evading the police, but stated it was because he thought the police might be looking for him because of the previous fight.

What happened next was the subject of conflicting testimony. The Flores family testified that Felix was standing in front of the slab and took, at most, two steps, and that Leonardo reached down as if he were going to open the passenger door and exit the vehicle, but instead raised a gun and just started shooting at Felix out of the open passenger window. Leonardo testified that when the Expedition was at the stop sign he heard Adriana scream, "Look out, look out," and when he turned he saw Felix at the passenger side window. Felix reached inside the open window and began "swinging" at him, Leonardo raised his hand to block Felix and "felt where he stabbed me." Leonardo then screamed, "Oh shit." Leonardo testified that he was "scared" and "panicked" because he was afraid Felix was going to kill him. Leonardo reached for his gun next to the console and began shooting at Felix with the gun extended through the open window. Michael testified that when he stopped the Expedition at the stop sign he heard a male voice yell something, saw Felix and Johnny Joe approaching the vehicle, and then Felix was there at the passenger window attacking Leonardo; Michael stated "there was a strike" and he got "scared" and "panicked." The next thing Michael knew, he heard Leonardo firing the gun. Michael did not see if Felix had something in his hand. Both Leonardo and Michael testified that everything happened very fast. Adriana testified that she saw Felix put his hands up and say something in Spanish, that she yelled to Leonardo, "Look out, look out" when she recognized Felix, that Leonardo was shocked and said "oh shit" when he saw Felix, and that Leonardo just started shooting at Felix with the gun extended outside the window; she saw Felix fall backwards. Adriana testified that Felix did not approach the Expedition and did not get close enough to stab Leonardo, although Felix was close enough "to threaten;" she did not hear Felix make any verbal threats. At trial, Adriana admitted lying when she initially told police she saw Felix at the window and saw him stab Leonardo on the arm. Adriana testified that she saw no weapons on Felix or anyone else in the Flores group at the 12th Street house.

It was undisputed that Leonardo fired the first gunshots at Felix. Some witnesses, including Johnny Joe Flores, Margie Gonzalez, and Janie Aguilar, testified that after Leonardo stopped shooting, Michael fired more shots. Michael denied ever shooting the gun, and Adriana stated she only saw Leonardo fire the gun. Felix was shot nine times, with the majority of the gunshots to his front right torso. Johnny Joe Flores was shot in the upper thigh as he pushed his wife out of the way. No weapons were recovered at the scene.

Immediately after the shooting, the Rivas brothers and Adriana drove off in the Expedition and went to Leonardo's home. Michael and Leonardo split up and ran off in different directions, while Adriana drove to her house. Leonardo testified he was "freaking out," "scared," and "crying." Michael stated Leonardo was crying and kept repeating, "I shot him, I shot him." Leonardo stated he was "in shock with what happened" and just started running; he threw the gun away when he realized he was still holding it. The investigating officers found spent shell casings in the road where the Expedition was parked. An examination of the Expedition showed none of Felix's blood was found on the inside or the outside of the Expedition. The gunshot wounds on Felix's body had no stippling, indicating the shots were not fired at close range, i.e., within two to three feet; however, the medical examiner did not receive Felix's clothing which could have contained soot from the gunshots. Felix's body was located near the cement slab. The distance from the cement slab to the location of the casings was approximately six to eleven feet. The fatal wound, a gunshot wound to Felix's ear which traveled down his skull and severed his spine, was fired from more than two to three feet away and would have incapacitated Felix where he stood. The medical examiner could not, however, determine the chronological order of the gunshot wounds or the exact distance between the shooter and the victim. The array of gunshot wounds was consistent with the shooter sitting down and the victim moving to avoid the shots. A few days after the shooting, Leonardo and Michael were separately located in San Antonio and arrested. At

that time, Leonardo had a small abrasion on his left hand and Michael had a small abrasion to the back of his head and a scratch on his chest.

Leonardo and Michael were indicted for Felix's murder and aggravated assault with a deadly weapon against Johnny Joe Flores. They were subsequently charged with conspiracy to commit Felix's murder. Adriana was also indicted for conspiracy to commit murder; she entered a plea and testified at trial against the Rivas brothers. Because the three indictments against Leonardo and Michael arose out of the same criminal episode, the indictments against each defendant were consolidated into a single criminal action. *See* TEX. PENAL CODE ANN. § 3.02(a), (b) (West 2011). The prosecutions against Leonardo and Michael were subsequently consolidated for trial under a single cause number. *See* TEX. CODE CRIM. PROC. ANN. art. 36.09 (West 2007). At the joint trial, both Leonardo and Michael raised self-defense, but the jury found them each guilty on all three counts, implicitly rejecting their claims of self-defense. Based on the jury's recommendation, the trial court assessed Leonardo's punishment at life imprisonment on the murder conviction and twenty years' imprisonment on the aggravated assault with a deadly weapon and conspiracy convictions, with all sentences to run concurrently.[3] Leonardo now appeals.

## ANALYSIS

Leonardo raises four issues on appeal, asserting that: (1) the trial court erred in denying his request for a jury instruction on sudden passion during the punishment phase; (2) the evidence is insufficient to support his conviction for conspiracy to commit murder; (3) the State knowingly presented perjured testimony during the guilt/innocence phase; and (4) the trial court erred in excluding testimony concerning a law enforcement officer's bias against Leonardo.

---

[3] Michael, a habitual offender, received three concurrent life sentences.

### *Sudden Passion Instruction*

During the punishment phase of trial, Leonardo adopted the request made by Michael for a jury instruction on sudden passion. The State objected there was no evidence of sudden passion, stating the issue was one of "pure self-defense." The trial court denied the instruction. On appeal, Leonardo contends there was at least some evidence that he experienced such a degree of fear or terror when Felix attacked him through the vehicle's window that he was incapable of cool reflection when he shot at Felix; therefore, he was entitled to receive a sudden passion instruction. The State replies that there is no believable evidence of provocation by Felix at the time of the shooting and, even if there was, it was not of such a type that would render an ordinary person incapable of cool reflection in his response; alternatively, the State argues that Leonardo was not harmed by the absence of the sudden passion instruction.

Once a defendant has been found guilty of murder, he may argue during the punishment phase that he caused the person's death while under the immediate influence of sudden passion arising from an adequate cause. TEX. PENAL CODE ANN. § 19.02(d) (West 2011); *see Trevino v. State*, 100 S.W.3d 232, 240 (Tex. Crim. App. 2003) (noting that sudden passion is solely a punishment issue, which may be raised after the defendant's intent to kill has already been affirmatively resolved). Sudden passion is a mitigating circumstance, which if proven by a preponderance of the evidence, reduces the murder from a first degree felony to a second degree felony subject to a maximum sentence of twenty years. TEX. PENAL CODE ANN. § 19.02(c), (d) (West 2011); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). "Sudden passion is 'passion directly caused by and arising out of provocation by the individual killed' which arises at the time of the murder." *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013) (quoting TEX. PENAL CODE ANN. § 19.02(a)(2)). The passion may not be solely the result of former provocation. TEX. PENAL CODE ANN. § 19.02(a)(2) (West 2011). "Adequate cause is a 'cause that

would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.'" *Wooten*, 400 S.W.3d at 605 (quoting TEX. PENAL CODE ANN. § 19.02(a)(1)). The defendant has the burden of both production and persuasion on the issue of sudden passion. *Wooten*, 400 S.W.3d at 605.

To be entitled to receive a jury instruction on the issue of sudden passion at punishment, the defendant must request the instruction and "the record must at least minimally support an inference: (1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; (3) that he committed the murder before regaining his capacity for cool reflection; and (4) that a causal connection existed 'between the provocation, passion, and homicide.'" *Id.* A jury should be instructed on sudden passion if the issue is raised by the evidence, even if that evidence is "weak, impeached, contradicted, or unbelievable;" however, the evidence "must not be so weak, contested, or incredible" that it could not support a finding of sudden passion by a rational jury. *Trevino*, 100 S.W.3d at 238. In determining whether it was error to deny the requested instruction on sudden passion, the reviewing court focuses on the evidence supporting the instruction, not on the evidence refuting it. *McKinney*, 179 S.W.3d at 569 (citing *Trevino*, 100 S.W.3d at 238-39).

If denial of the sudden passion instruction was error, and the error was preserved, the court must determine whether the appellant suffered "some harm." *Wooten*, 400 S.W.3d at 606 (harm analysis is conducted under the standards set out in article 36.19 of the Code of Criminal Procedure); *see* TEX. R. APP. P. 44.2(b) (harm standard for non-structural error). The degree of harm is evaluated in view of the complete jury charge, counsel's arguments, the evidence as a whole, including the contested issues and the weight of the probative evidence, and any other

relevant factors contained in the record. *Wooten*, 400 S.W.3d at 606. The reviewing court's focus is "to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction." *Id.*

Assuming, without deciding, that the evidence was sufficient to at least minimally support an inference that Leonardo acted under the immediate influence of sudden passion arising from an adequate cause, we conclude the denial of a jury instruction on sudden passion did not harm Leonardo. *See id.* at 607 (declining to address whether trial court erred in denying a sudden passion instruction because harm analysis was dispositive). The record shows there were two competing theories at trial—the State's assertion that Leonardo and Michael went looking for Felix after he stabbed Michael and intentionally killed him in cold blood, and the defense's assertion that after Felix rushed their vehicle and attacked Leonardo, Leonardo shot Felix in self-defense. The jury heard the evidence in support of self-defense and implicitly rejected it by finding Leonardo and Michael guilty of intentionally murdering Felix. We acknowledge that just because a jury rejects a defendant's self-defense theory at guilt/innocence does not necessarily mean the defendant is not entitled to a sudden passion instruction at the punishment phase, or that the jury would reject sudden passion as mitigation of punishment. *See Trevino*, 100 S.W.3d at 242 (recognizing that, depending on the facts, there could be evidence that was not discredited by the rejection of self-defense which supports a claim of sudden passion). The evidence supporting a jury's rejection of self-defense does, however, factor into the harm analysis with respect to the erroneous denial of a sudden passion instruction, and may demonstrate the absence of harm depending on the facts. *See id.*; *see also Wooten*, 400 S.W.3d at 609.

Here, the jury heard substantial evidence contradicting the claim of self-defense, including the following: (1) the testimony by Adriana and the witnesses at the Flores house that Felix was standing next to the cement slab and did not get close to the Expedition, taking at most two to three

steps before Leonardo started shooting at him; (2) the testimony by law enforcement officers that Felix's body was lying by the cement slab and there was no blood trail between the body and the street; (3) the testimony by the witnesses at the Flores house that the Expedition stopped at the property line and several feet short of the stop sign, thus contradicting Michael's testimony they were "just cruising;" (4) Adriana's testimony that Leonardo stated he "knew where Felix would be," and was going to make his brother Michael "a believer;" (5) Johnny Joe and Margie's testimony that they heard a male voice inside the vehicle say, "There he is" or "Yeah, that's him" when the Expedition stopped in front of the Flores house, supporting an inference that Leonardo and Michael had come to find Felix; and (6) the witness testimony and admission by Leonardo that he extended his hand outside the window when he fired the gun at Felix, the testimony that none of Felix's blood was found on the outside or inside of the Expedition and that there was no stippling around his gunshot wounds as expected when a gun is fired at close range, which supports an inference that Felix was not within two to three feet of the vehicle when Leonardo shot him. Further, Leonardo admitted retrieving his handgun after learning that Michael had been stabbed and before they left in the Expedition, and there was testimony that Leonardo was heard loading the gun before leaving the party; these actions occurred prior to any provocation by Felix against Leonardo. Such evidence showing that a defendant anticipated the event and prepared himself to respond to the expected altercation tends to show deliberation and undermines a claim of sudden passion. *McKinney*, 179 S.W.3d at 570; *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986). Further, Leonardo cannot base his sudden passion claim solely on the former provocation by Felix against Michael. TEX. PENAL CODE ANN. § 19.02(a)(2); *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd). Finally, the jury was entitled to consider Leonardo's actions after the shooting, i.e., he immediately fled the scene, he split up from his

- 10 -

brother and Adriana, he disposed of the gun, and he left town. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (flight is evidence of consciousness of guilt).

As noted, the evidence supporting rejection of a self-defense claim may, depending on the facts of the case, demonstrate the absence of any harm from denial of a sudden passion instruction. *See Wooten*, 400 S.W.3d at 609; *see also Trevino*, 100 S.W.3d at 242. Indeed, we have previously recognized that, except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion. *See Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio 1999, pet. ref'd) (citing *Benavides v. State*, 992 S.W.2d 511, 524-25 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd)). Based on our review of the record as a whole, we conclude that, in this case, the evidence contradicting Leonardo's claim of self-defense is also sufficient to establish the absence of harm from the denial of a sudden passion instruction. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Wooten*, 400 S.W.3d at 608.

### *Conspiracy to Commit Murder*

As noted, Leonardo was also convicted of conspiracy to commit murder, a second degree felony, and received a twenty-year sentence of imprisonment. The indictment alleged that, with the intent that murder be committed, Leonardo agreed with Adriana and Michael that one of them would cause the death of Felix Flores by shooting him with a handgun, and that Leonardo performed an overt act in pursuance of such agreement by shooting Felix. A person commits criminal conspiracy when (1) with intent that a felony be committed, (e.g., murder), (2) he agrees with one or more persons that one or more of them will engage in conduct that constitutes the felony offense, and (3) he or one or more of them performs an overt act in pursuance of the agreement. TEX. PENAL CODE ANN. § 15.02(a) (West 2011). The essential element of criminal

conspiracy is an agreement to commit a crime. *Williams v. State*, 646 S.W.2d 221, 222 (Tex. Crim. App. 1983).

Leonardo challenges his conspiracy conviction by asserting there was no evidence of any agreement between him and Michael and/or Adriana to shoot and kill Felix Flores that night. He relies on the testimony by all three co-defendants denying that there was any discussion or agreement among them about killing Felix. However, direct evidence of an agreement among conspirators is not required and rarely exists. *Williams v. State*, 82 S.W.3d 557, 564-65 (Tex. App.—San Antonio 2002, pet. ref'd). Conspiracy must often be proven by "circumstances from which the existence of the conspiracy is logically deducible." *Id.* at 565; *Butler v. State*, 758 S.W.2d 856, 860 (Tex. App.—Houston [14th Dist.] 1988, no pet.) (noting that because conspirators' work is often clandestine in nature, direct evidence is not required and circumstantial evidence will suffice). Indeed, the statute explicitly states that the existence of an agreement constituting a conspiracy may be inferred from the parties' acts. TEX. PENAL CODE ANN. § 15.02(b) (West 2011).

Here, the record contains sufficient circumstantial evidence to support a reasonable inference of an agreement between Leonardo and Michael and/or Adriana to murder Felix that night. Several statements were made by Leonardo and Michael from which an inference of an agreement to murder Felix can be drawn. Michelle Benavides, who lived at the trailer next door to the party on Cedar Street and was the niece of Felix Flores, testified she heard Leonardo, Michael, and Adriana arguing by a black Expedition at about 12:20 p.m. on the night of Felix's murder. She heard Leonardo say, "F\*\*k them. I already told these mother f\*\*kers they're not going to f\*\*k with us," and then in response to something said by Michael, he stated, "F\*\*k that, Bro. F\*\*k that shit. I'm tired of their shit." The three then got in the Expedition and drove off. Michelle Benavides' ex-husband, Stephen Rodriguez, testified he heard the Rivas brothers talking

next door and heard **Michael** say, "Hey Bro, let's - - you want to ride with me to go get this mother f**ker?" He testified that Leonardo initially said, "No Bro, I'm cool," but later said, "Let's just ride." Before they got in the Expedition and drove away, Rodriguez heard a gun being loaded with a clip and the chamber being pulled back or "racked." About 20 to 30 minutes later, he heard gunshots in the neighborhood and learned that Felix had been shot. As detailed above, Adriana testified she heard Leonardo say he "knew where Felix would be" before they left the party, and heard Leonardo tell Michael, "I'm going to make you a believer" as they were driving toward Felix's house. In addition, Johnny Joe and Margie heard a male voice belonging to either Leonardo or Michael say, "Yeah, that's him" or "There he is" when the Expedition stopped in front of the Flores house. Leonardo's action in going to get his gun after Michael told him that he had been stabbed, along with the sound of the gun being "racked" or loaded, when viewed in the context of the statements further supports an inference that the intent behind taking the gun was to shoot Felix, not merely one of self-protection. Michael's actions in evading police on the way to the Flores house and in stopping the Expedition not at the stop sign, but three to four feet short in front of the Flores' yard also support the existence of an agreement to shoot Felix. Finally, the fact that all three individuals fled in the Expedition immediately after the shooting, and then split up with each going in a different direction, also constitutes circumstances from which a conspiracy can be inferred. We conclude the circumstantial evidence is legally sufficient to support the jury's finding of a conspiracy to murder the victim. *Williams*, 82 S.W.3d at 564-65; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (legal sufficiency standard of review).

### *Perjured Testimony*

Leonardo next asserts the State knowingly presented or failed to correct false testimony that Felix was not a member of the Mexican Mafia, and tried to exclude testimony that Felix was a Mexican Mafia member, which violated his due process rights and undermined his self-defense

claim. *See Ex parte Castellano*, 863 S.W.2d 476, 481 (Tex. Crim. App. 1993) (the State violates a defendant's right to due process when it actively or passively uses perjured testimony to obtain a conviction). Specifically, Leonardo argues that the prosecutor knew that Felix was a Mexican Mafia member but allowed the State's witnesses to testify that he was not a member. Leonardo points to the testimony by Johnny Joe Flores, Margie Gonzalez, and Janie Aguilar as well as two law enforcement officers concerning their knowledge about Felix's membership in the Mexican Mafia. Each of the Flores family witnesses stated that, to their knowledge, Felix was not a Mexican Mafia member: Johnny Joe testified that he was never a part of the Mexican Mafia and did not know anyone who was a member; his wife Margie testified that she never knew Johnny Joe or Felix to be a member of the Mexican Mafia, and denied knowing anyone who claimed to be a member; Felix's girlfriend, Janie, testified she never knew Felix to be in the Mexican Mafia and they never discussed the gang. Hondo Police Sergeant Ricardo Garza, when asked if he knew whether Felix Flores, Johnny Joe Flores, or Leonardo Rivas were members of the Mexican Mafia, answered "No." When asked the same question with regard to Michael Rivas, Sergeant Garza answered, "Yes." Finally, Officer Ramiro Guedea was asked, "Do you know from personal experience whether or not Felix Flores was a member of the Mexican Mafia?" and answered "No." When Officer Guedea then added, "I do now," the State objected that the answer was speculation not based on personal knowledge. The trial court instructed defense counsel to rephrase the question using a proper predicate, but counsel opted to address the issue through a different witness. There was no abuse of discretion in the court's ruling. With respect to Leonardo's claim of perjury, there is nothing in the record to show the witnesses lied with respect to their personal knowledge of Felix's membership in the Mexican Mafia. The fact that another witness later testified to his own knowledge and belief that Felix was a Mexican Mafia member does not render the other testimony perjured, but merely creates conflicting evidence for the jury to consider and

- 14 -

weigh.[4] *See Farrakhan v. State*, 263 S.W.3d 124, 131 (Tex. App.—Fort Worth 2006), *aff'd*, 247 S.W.3d 720 (Tex. Crim. App. 2008) (perjury is committed by making a deliberate and willful false statement under oath).

Leonardo also complains that the State objected to his attempts to elicit testimony about the significance of Felix's tattoos. He points to the State's objections that Officer Guedea and Sergeant Valenzuela were not qualified to testify that Felix's tattoos were an indication of his association with the Mexican Mafia.[5] Even if the trial court's rulings sustaining those objections were an abuse of discretion, there was no harm because the same evidence was presented through different witnesses. Sergeant Garza, a State witness, testified to his substantial training and experience with respect to gangs operating in Texas, and explained that the tattoo on both sides of Michael's neck is the Aztec god of war or an Aztec warrior. Garza testified that the tattoo is affiliated with the Mexican Mafia. A photograph of Michael's neck tattoo was admitted. Sergeant Garza further testified that in order to have tattoos associated with the Mexican Mafia a person must have consent from ranking members of the gang; he also explained that having a particular Mexican Mafia tattoo does not necessarily mean that the person is high ranking within the organization. He explained the hierarchy and the level of a "prospect," which Michael testified he knew Felix to be. Finally, Garza stated his opinion in front of the jury that one of the tattoos on Felix's body depicted an Aztec warrior similar to the one on Michael's neck, and that Felix's tattoo creates a suspicion of his Mexican Mafia association. Several autopsy photographs of the tattoos on Felix's body and face were admitted. In addition, Michael testified that a person cannot get the

---

[4] Michael Rivas testified that he "knew from talking to Felix that he was a "prospect" in the Mexican Mafia.

[5] The bill of exception created for Officer Guedea's excluded testimony on the issue shows he would have testified that Felix's tattoos are indicative of membership in a prison gang, but "not particularly the Mexican Mafia." The bill of exception for Sergeant Valenzuela shows he would have testified that, "Based off of what I've seen . . . in training and what I see online . . . I would suspect that he'd be part of the Mexican - - that he would be suspected of being either an associate or some sort of member of an organization, yes."

type of tattoos that Felix had unless he was affiliated with the Mexican Mafia, as Michael himself had been. Thus, the jury had the opportunity to consider Sergeant Garza's testimony and compare the tattoo photographs in resolving the conflicts in the evidence with regard to Felix's Mexican Mafia association. We conclude the record does not support Leonardo's assertion that the State knowingly presented perjured testimony concerning Felix's membership in the Mexican Mafia and that he was not harmed by the court's rulings on the State's objections.

### *Exclusion of Testimony Showing Bias*

In his last issue, Leonardo argues the trial court erred in excluding testimony by Julianna Jasso concerning Sergeant Brian Valenzuela's bias or prejudice against Leonardo based on both men's prior relationship with Jasso by whom they both have children. Specifically, Leonardo complains that Jasso was not permitted to answer his question asking whether Sergeant Valenzuela had ever harassed her and Leonardo when they were dating by stopping them when they were together. The State's objection that the question called for speculation on the part of Jasso was sustained. There is nothing in the record to show what Jasso's answer would have been. *See Holmes v. State*, 323 S.W.3d 163, 168, 170 (Tex. Crim. App. 2009) (recognizing a distinction between the exclusion of impeachment evidence going to the substance of the evidence, which must be preserved by bill of exception or otherwise under Texas Rule of Evidence 103(a)(2), and impeachment evidence going to a witnesses' truthfulness or bias, for which identification of the general subject matter is sufficient).

Assuming, without deciding, that the trial court's ruling was error, the record shows that any error was harmless because other testimony was admitted pertaining to possible bias by Valenzuela against Leonardo. Both Valenzuela and Jasso testified about their own prior relationship which produced two children and to the fact that Jasso subsequently had two more children with Leonardo. Jasso was allowed to testify that she had issues with Valenzuela about

her visitation hours while she was dating Leonardo. Valenzuela testified that his relationship with Jasso ended in 2005, and that he had primary custody of their two children and Jasso had visitation rights. Leonardo's cross-examination of Valenzuela was not restricted, and he had the opportunity to question Valenzuela about any potential bias or prejudice Valenzuela had against him stemming from his relationship with Jasso. Leonardo was further able to cross-examine Valenzuela about his actions during the investigation of Felix's murder, i.e., that Valenzuela instructed another officer to pick up shell casings in the street where EMS might park, and that Valenzuela was the recipient of an unsolicited statement from Adriana that Leonardo was the shooter. The jury had the benefit of this evidence in assessing the credibility of Sergeant Valenzuela's trial testimony and the propriety of his actions during the investigation. Therefore, Leonardo was not harmed by any error in excluding the challenged testimony. TEX. R. APP. P. 44.2(b).

## CONCLUSION

Based on the foregoing reasons, we overrule Leonardo's issues on appeal and affirm the trial court's judgments.

Rebeca C. Martinez, Justice

PUBLISH