Homero HERRERA, Appellant

v.

The STATE of Texas, Appellee

No. 04–16–00138–CR

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: December 30, 2016

Vincent D. Callahan, Attorney at Law, San Antonio, TX, for Appellant.

Robert Lee Little, Assistant District Attorney—293rd Judicial District, Roberto Serna, District Attorney—293rd Judicial District, Eagle Pass, TX, for Appellee.

Sitting: Patricia O. Alvarez, Justice, Luz Elena D. Chapa, Justice, Jason Pulliam, Justice ·

## OPINION

Opinion by: Patricia O. Alvarez, Justice

Appellant Homero Herrera was charged with the murder of Blanca Herrera, his wife, alleged to have been committed on October 9, 2013. On January 20, 2016, after previously returning a guilty verdict, a Maverick County jury sentenced Herrera to thirty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In his sole issue on appeal, Herrera contends the trial court erred in failing to include an instruction on sudden passion. Because the record does not support that Herrera suffered "some harm," we affirm the trial court's judgment.

### PUNISHMENT INSTRUCTION ON SUDDEN PASSION

All parties agree that Herrera killed Blanca. As Herrera's trial counsel explained, the only question for the jury was "what possibly was going through [Herrera's] mind." During the charge conference on punishment, Herrera's trial counsel requested an instruction on sudden passion. The trial court denied the request.

### A. Sudden Passion

"[M]urder committed under the 'immediate influence of sudden passion arising from an adequate cause' is a second-degree felony carrying a maximum punish-

ment of twenty years' imprisonment." *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013) (quoting TEX. PENAL CODE ANN. § 19.02(d) (West 2011)). "Sudden passion is 'passion directly caused by and arising out of provocation by the individual killed' which arises at the time of the murder." *Id.* (quoting TEX. PENAL CODE ANN. § 19.02(a)(2)). "Adequate cause is 'cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.'" *Id.* (quoting TEX. PENAL CODE ANN. § 19.02(a)(1)).

In the present case, Herrera was entitled to a sudden passion instruction if the record supports an inference that

(1) Herrera was acting under the immediate influence of passion, such as terror, anger, rage, or resentment;

(2) Herrera's sudden passion was, in fact, induced by some provocation, at the time of the murder, by Blanca which provocation would commonly produce such a passion in a person of ordinary temper;

(3) Herrera committed the murder before regaining his capacity for cool reflection; and

(4) That a causal connection existed "between the provocation, passion, and homicide."

*See id.*; *accord McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). If Herrera raised evidence from any source, regardless of whether evidence is weak, contradicted, or unbelievable, Herrera met his burden and the trial court was required to submit the requested instruction. *See Wooten*, 400 S.W.3d at 605; *see also McKinney*, 179 S.W.3d at 569; *Trevino v. State*, 100 S.W.3d 232, 238–39 (Tex. Crim. App. 2003) (per curiam).

We thus turn to the evidence presented to determine whether the trial court was required to provide the requested instruction.

## B. Testimony Adduced at Trial

The jury heard testimony from several witnesses over several days of trial. Eagle Pass Police Officer Rigoberto Covarrubias described the scene at the Herrera residence on the night of the murder. He described seeing a lifeless Blanca, and Herrera bleeding from his neck. Officer Covarrubias described Herrera's injury as life-threatening and relayed that he "jumped on the bed and began applying pressure to [Herrera's] neck."

Eagle Pass Police Detective Ricardo Salazar also arrived shortly after the 911 call was placed. Both Detective Salazar and Police Chief Albert Guajardo described the scene upon their arrival, including the amount of blood on the bed, Herrera's injuries, and Blanca's lifeless body. The Webb County Medical Examiner testified Blanca was stabbed six times and that the cuts and lacerations on her right hand were indicative of defensive types of wounds. More specifically, Blanca was trying to shield herself from the attack.

The jury also heard from Tomas Tovar, a friend of Herrera's and Blanca's for seventeen years. Tovar testified that he spoke with Herrera two days before the murder, and that Herrera was mad. "[Herrera] said he was going to kill Mrs. Blanca. . . . He was fed up. [He] was tired." Tovar continued, "[Herrera] said he was going to kill his wife, and he would kill himself or he would spend his last day in jail."

Two days after the murder, Texas Ranger Roger Dixon spoke with Herrera at University Hospital in San Antonio, Texas. Texas Ranger Dixon testified that Herrera was *Mirandized* and that Herrera indicated his desire to speak with the officer. During the interview, which was recorded

and transcribed for the jury, Herrera described the evening in question:

> Well, that night what happened was that she had been talking on the phone for several days with another man. And there were texts from the man which send [sic] her. (pause) She would show them to me.
>
> . . . .
>
> It had gone on for days. She could—she would call constantly on the phone with the man.

During the interview, Herrera explained that he thought Blanca was having an affair.

> And then one thing that I did not want to do (pause) that (pause) I did. (Pause) It overcame me. My mind got the best of me. The one thing that I did not want to do, I did.

Texas Ranger Dixon questioned Herrera about the knife, specifically when he retrieved the knife, and whether Blanca was asleep when he stabbed her.

> She was awake. . . . She just screamed. (pause) That's all. . . . She was in bed (pause) lying down. . . . I hit her with the knife.

Herrera further described himself as,

> Angry. Blind. (pause). It's that (pause) I had too many days with that. Herrera further acknowledged that he wanted to get back at Blanca, but that he did not want to get divorced. They were lying in bed. I got out of bed. . . . I went for the weapon.

Herrera told the officer that Blanca did not see him coming and that he had wanted to die. He described Blanca as fighting back, "she grappled."

Finally, the jury heard from Dr. Jack Gordon Ferrell Jr., a psychologist. During the guilt-innocence phase, Dr. Ferrell described meeting with Herrera on two occasions. Dr. Ferrell explained that Herrera was neither incompetent nor insane, but he did have a diminished capacity. He testified Herrera described a significant amount of distress in his marriage leading up to the incident—intensifying distress, frustration, arguments, and name-calling. Although Dr. Ferrell did not believe Herrera had an actual plan or intent to commit the assault, he acknowledged that when Herrera retrieved the knife from the kitchen, he was planning to use it. Dr. Ferrell opined Herrera was schizoid and schizotypal meaning that Herrera could not function well socially, could not handle things that invaded his territory, and that he was avoidant and compulsive. He described Herrera as "feel[ing] trapped and [acting] out." As support for his diagnosis, Dr. Ferrell read several direct quotes that he noted during his conversations with Herrera.

> My brain was broken. It was not making very much sense. And I went back in and laid down next to her and then stabbed her and stabbed myself.
>
> . . . .
>
> Why would I want to go on living when I'm verbally assaulted in my own house.

Dr. Ferrell further explained that once Herrera had an idea in his head, it was not easy for him to "get rid of it," particularly when the conflict was ongoing in his home. More specifically, Dr. Ferrell described Herrera as unable to "get rid of the rancor that he was experiencing." Dr. Ferrell explained the different tests he performed and Herrera's ability to function well in one setting, and not in another.

During the punishment phase of the trial, Dr. Ferrell was again called to testify. Dr. Ferrell testified, that in his opinion, the events on the night in question forced Herrera "to erupt."

> [Herrera] described himself as getting more and more frustrated. That [Blanca]

went to the bathroom, was talking loudly so that he could hear. Showed him the picture of the man or the telephone thing.

And he said, "Before that, I was lying down on the bed trying to just get away from what she was saying to me."

. . . .

When she came [back to the bedroom] and laid down on the bed, too, and I think was there for a few moments, and said, "I just had to get away. So I went into the kitchen." ... "I didn't know right then [why he was going to the kitchen]. But I knew that I had to get away from her, because she was just continuing."

At that point, Dr. Ferrell testified that Herrera was incapable of handling his frustration. Herrera proceeded to stab Blanca and then himself in an attempt to escape the situation. In Dr. Ferrell's opinion, Herrera's emotions could not be controlled and his actions were "impulsive, almost instantaneous at some point."

## C. Charge Error

■ If sudden passion was raised by the evidence, Herrera was entitled to the instruction—even if the evidence to support the instruction was weak. *See Wooten*, 400 S.W.3d at 605; *McKinney*, 179 S.W.3d at 569; *Trevino*, 100 S.W.3d at 238–39. "An appellate court's duty is to look at the evidence supporting the charge of sudden passion, not the evidence refuting it." *Beltran v. State*, 472 S.W.3d 283, 294 (Tex. Crim. App. 2015). Regardless of whether the evidence is weak or impeached, the trial court must provide the requested sudden passion charge even in the face of contradictory evidence presented by the State. *Id.* "If there is 'some' evidence that a defendant acts with sudden passion, he is entitled to the charge." *Id.*

■ Assuming, without deciding, that the trial court erred in failing to provide the requested instruction, we note that Herrera must still prove he was harmed by the lack thereof. We thus turn to whether Herrera was harmed by the trial court's failure to include the sudden passion instruction. We also note that a trial court's failure to include the requested instruction does not, without more, mandate a showing of harm. *See Wooten*, 400 S.W.3d at 606; *Trevino*, 100 S.W.3d at 241.

## D. Harm Analysis

*1. Reversal Required Upon Showing Herrera Suffered "Some Harm"*

■ An appellate court reviews jury charge error under the two-prong test set forth in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988). Because Herrera timely requested an instruction on sudden passion, this court will reverse the trial court's judgment if Herrera suffered "some harm" as a result of an error, if any. *See Almanza*, 686 S.W.2d at 171; *see also Payne v. State*, 11 S.W.3d 231, 232 (Tex. Crim. App. 2000) (holding jury-charge error to be nonstructural). For harm to result, however, the record must show " 'actual, rather than merely theoretical, harm.' " *Segovia v. State*, 467 S.W.3d 545, 556 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). An appellate court is further directed to consider " 'the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.' " *Id.* (quoting *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim.

App. 2011)); *see also Almanza,* 686 S.W.2d at 171.

The error requires reversal if it was "calculated to injure [Herrera's] rights." *See Jimenez v. State,* 32 S.W.3d 233, 237 (Tex. Crim. App. 2000). In other words, Herrera must have suffered some harm. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Trevino,* 100 S.W.3d at 242 (citing *Almanza,* 686 S.W.2d at 171). "[W]e focus on the evidence and record to determine the likelihood that a jury would have believed that [Herrera] acted out of sudden passion had it been given the instruction." *Wooten,* 400 S.W.3d at 606.

*2. Sudden Passion's Immediacy Requirement*

Sudden passion requires the circumstances be such as "to give rise to an immediate influence of sudden passion." *McKinney,* 179 S.W.3d at 570 (emphasis added). We examine the evidence, and the record as a whole, "with an eye toward determining the likelihood that the jury would have accepted the appellant's sudden passion claim." *Wooten,* 400 S.W.3d at 608 n.38; *Bufkin v. State,* 207 S.W.3d 779, 782 (Tex. Crim. App. 2006) (viewing the evidence in the light most favorable to the requested defensive instruction). The jury is the sole judge of the credibility of the witnesses and is free to accept or reject some, all, or none of the evidence presented by either side. *Lancon v. State,* 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). We, therefore, turn to the evidence presented.

*3. Evidence of Harm*

Here, a review of the entire record, including all of the evidence favoring Herrera, supports that Blanca's alleged "taunting" and Herrera's emotions related to Blanca's affair were mounting for weeks and months. *See McKinney,* 179 S.W.3d at 570. According to the testimony of his

expert, Herrera got out of bed, went to the kitchen, came back to the bedroom, laid next to Blanca, and then decided to stab her six times. Herrera's psychologist testified that Herrera's mental state, specifically his being short-tempered and reacting violently to minor provocations, led to irrational belief.

During the guilt-innocence phase of trial, Dr. Ferrell testified about the deteriorating relationship between Herrera and Blanca. He described approximately thirty days of conflict and confusion in Herrera's life, the accusations asserted by both parties, and the increased distress, name-calling, and provocative behaviors of each. Dr. Ferrell further described Herrera's behavior as aberrant, that Herrera could not function, and that Herrera did not feel in control of anything that was happening in his life. Dr. Ferrell described Blanca's involvement with another man, her flaunting the affair in front of Herrera, and Blanca showing Herrera the number of times the other man was calling and the pictures that he was sending. According to Dr. Ferrell, in Herrera's mind, Herrera did not believe that he could escape or "get rid of" the conflict that was intensifying over time.

During the punishment phase, Dr. Ferrell testified that, in his opinion, Herrera was in the midst of "sudden passion" on the night in question, Blanca's actions caused Herrera to "erupt" and that his reaction was impulsive and instantaneous. Herrera was unable to explain why he moved from the bedroom to the kitchen. "He just had to get rid of her. She just kept continuing."

On cross-examination, however, Dr. Ferrell conceded that Herrera's threats against Blanca, made to Tovar two days before the murder, were inconsistent with sudden passion. *See Rivas v. State,* 473 S.W.3d 877, 884–85 (Tex. App.—San Anto-

nio 2015, pet. ref'd) (rejecting's defendant's claim of sudden passion when defendant anticipated the event and prepared himself to respond to the expected altercation tended to show deliberation); *see also* *McKinney*, 179 S.W.3d at 570.

### 4. Analysis

▉ For the jury to reduce the first-degree murder charge to a second-degree offense based on sudden passion, the jury was required to find an "immediate influence of sudden passion arising from an adequate cause." *See* TEX. PENAL CODE ANN. § 19.02(d); *McKinney*, 179 S.W.3d at 570. More specifically, the evidence was required to support a finding that Herrera reacted based on "passion directly caused by and arising out of provocation" by Blanca. *See* TEX. PENAL CODE ANN. § 19.02(a)(2); *McKinney*, 179 S.W.3d at 570.

The overwhelming evidence presented at trial was that the conflict between Herrera and Blanca had been mounting for several weeks, if not months. Herrera was convinced Blanca was having an affair and Blanca was clearly taunting Herrera with photographs and text-messages from another individual. The jury heard testimony from Tomas Tovar who described himself as a close friend, for over seventeen years, to both Blanca and Herrera. Tovar's testimony, regarding a conversation between himself and Herrera two days before the murder, supported that any provocation by Blanca was ongoing prior to the night of the murder.

Finally, we turn to Dr. Ferrell's testimony. During the guilt-innocence phase, Dr. Ferrell was unable to testify regarding "sudden passion." He testified, however, that Herrera could not control his emotions, that the distress and taunting in the house was beating up on Herrera and he did not have another outlet that night. The jury returned a unanimous verdict that Herrera was guilty of murder.

During the punishment phase, Dr. Ferrell's testimony was similar to his earlier testimony. The parameters of the punishment phase, however, provided that Dr. Ferrell was able to testify that based on his conversations with Herrera, and the diagnostic tests he conducted, Herrera's actions were consistent with sudden passion. However, on cross-examination, when Dr. Ferrell was questioned about the effect of Tovar's testimony that Herrera made statements two days before the incident that he planned to kill his wife, Dr. Ferrell conceded these statements were inconsistent with sudden passion.

We, therefore, conclude that even viewing all of the evidence in Herrera's favor, it is unlikely that the jury would have found sudden passion had the trial court included the requested instruction. The record does not support that, based on the trial court's failure to provide the requested sudden passion instruction, Herrera suffered "some harm" as required by *Almanza*.

Accordingly, we affirm the trial court's judgment.