**Opinion issued June 15, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00179-CR

_____

**EDWIN FIGUEROA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1627794**

---

## MEMORANDUM OPINION

A jury found appellant, Edwin Figueroa, guilty of the first-degree felony offense of murder.[1] After making a negative finding on a sudden passion special issue, the jury assessed Figueroa's punishment at thirty-seven years' confinement.

---

[1] *See* TEX. PENAL CODE § 19.02(b)(1)–(2).

In two issues, Figueroa contends that (1) legally and factually insufficient evidence supports the jury's negative finding on the sudden passion special issue; and (2) the trial court erred by including surplus language in the punishment-phase charge relating to parole. We affirm.

## Background

Former high school sweethearts Edwin Figueroa and Lisbeth Cabrera are common-law married and have two young children together. They also worked together as owners and operators of a roofing business in Houston. The complainant, Raphael Serrano Nunez, was one of their employees. More than just an employee, however, Nunez was also Figueroa's friend. When Nunez started to slide off a roof on a cold, wet day, Figueroa managed to grab him and take the brunt of the fall himself. He also helped Nunez when Nunez had an encounter with Immigration and Customs Enforcement. Figueroa helped Nunez because "[h]e was family. You look out for family."

One night, Figueroa and Nunez went to a bar together, and Figueroa started talking to a woman. Nunez gave Figueroa's phone number to the woman, and she and Figueroa started texting. This progressed to Figueroa taking the woman to Nunez's apartment—at Nunez's suggestion—and having sex with her. Unbeknownst to Figueroa at the time, Nunez told Cabrera about Figueroa's affair.

When Cabrera found out about Figueroa's infidelity, she kicked him out of their house, and they separated. Figueroa then moved in with Nunez and stayed at his apartment. Again unbeknownst to Figueroa, Nunez and Cabrera started dating. Figueroa knew that Nunez was seeing a woman because Nunez had a habit of telling Figueroa what he would do with this woman, but Figueroa did not know that the woman Nunez was describing was Cabrera. Nunez and Cabrera dated for approximately two months.

On April 10, 2019, Figueroa, Nunez, and several other employees of Figueroa's roofing company were working at a construction site on the far north side of Houston. They arrived at the site around 7:00 a.m. Throughout the day, Figueroa kept texting Cabrera. He had grown suspicious about how Cabrera had learned of his extramarital affair, and he finally asked her if she was "talking to" Nunez. Cabrera denied it, but Figueroa remained unconvinced.

Immediately after this text exchange with Figueroa, Cabrera sent Nunez a text message informing him of Figueroa's suspicions. She instructed Nunez to deny that they were having an affair if Figueroa asked. At this time, Nunez was working, but his phone was playing music for the workers. Figueroa looked at Nunez's phone and saw Cabrera's message. This message did not state that it was from Cabrera; instead, Nunez had Cabrera listed in his phone as "my queen" in Spanish. Figueroa saw this message around 5:00 or 5:30 p.m.

3

Angry and crying, Figueroa called Cabrera and demanded to know whether she was having an affair with Nunez. According to Figueroa, Cabrera again denied having an affair, so he decided to confront Nunez. Nunez also denied having an affair with Cabrera, saying that "it wasn't what [Figueroa] thought it was." Enraged, Figueroa started punching Nunez, hitting him several times in the face and head. The argument and physical fight lasted for approximately ten minutes before Figueroa fired Nunez and ordered him to leave the construction site.

Nunez complied and called Cabrera, who called a ride-sharing service to pick Nunez up from the site. Although Nunez wanted to see Cabrera, she was afraid of what might happen if Figueroa saw them together. Nunez decided to go back to his apartment and take a shower.

Meanwhile, Figueroa remained at the construction site for approximately two more hours. Although he tried to continue working, he "was thinking of how everything happened." Worried that Cabrera was going to take their kids and leave with Nunez, Figueroa repeatedly called and texted her, but she would not answer him. Figueroa also called Cabrera's mother and sisters to "find answers."

Finally, around 7:30 p.m., Figueroa left the construction site and started driving around in his car. He stopped at a nearby gas station and bought a six-pack of beer, which he drank in an effort to "make the pain go away." Figueroa continued thinking "[a]bout all the things [Nunez] was telling [Figueroa] he was doing with

4

the female, but in reality that was [Figueroa's] wife he was describing." Eventually, he decided to go to the neighborhood where he had grown up to purchase a gun.

The drive to his old neighborhood took Figueroa approximately one hour, so it was around 8:30 p.m. when he purchased the gun. Figueroa repeatedly testified that he did not have a plan to kill Nunez, but he wanted to make Nunez hurt, so he decided to shoot Nunez in the genitals.

Figueroa drove to the apartment that he had been sharing with Nunez. Although he had a key, he could not enter through the front door because Nunez had dead-bolted the door. He could not enter through the sliding door on the back patio because that door only opened from the inside, so Figueroa had to enter the apartment through a window off the patio. Figueroa "really wanted to stop, but the voices in [his] mind were telling [him] to just keep going." He then consumed some cocaine that was on Nunez's kitchen counter and searched for Nunez in the apartment. Nunez was not in his bedroom, but the shower was running, so Figueroa assumed that Nunez was in the shower. Once inside the bathroom, Figueroa shot twice in the direction of the shower. When he tried to shoot a third time, the gun jammed.

Bullets struck Nunez in the chest and left hand, but he was able to get out of the shower. Both men ran out of the apartment. Nunez made it to the parking lot, where he collapsed, unclothed and bleeding. A resident of the apartment complex

called 911 at 9:11 p.m., and paramedics transported Nunez to the hospital. On the way, Nunez was able to tell medical personnel that "his boss" shot him. Nunez went into cardiac arrest several times at the hospital, and he passed away early on April 11, 2019.

After leaving Nunez's apartment, Figueroa called Cabrera and told her that he had tried to shoot Nunez. They met up at a local Wal-Mart, and Figueroa requested that they drive to San Marcos with their children. They spent the night in a hotel near San Marcos. The next day, they both learned that Nunez had died from his injuries. At Cabrera's request, Figueroa agreed to return to Houston, and he turned himself in to police. He also turned over the clothes he had been wearing during the shooting, as well as the gun he had purchased. During his custodial interview, Figueroa admitted to shooting Nunez.

The jury found Figueroa guilty of the offense of murder. During the punishment phase, Figueroa raised the special issue of sudden passion, arguing that he caused Nunez's death "under the immediate influence of sudden passion arising from an adequate cause," entitling him to a reduction of the offense from a first-degree felony to a second-degree felony. In the punishment-phase charge, the trial court submitted the sudden passion special issue to the jury. The charge also included two instructions that informed the jury that it could not consider how the law of parole might be applied to Figueroa or how much of his sentence he would have to

serve because such decisions were within the exclusive jurisdiction of parole authorities.

The jury made a negative finding on the sudden passion special issue, finding that Figueroa did not cause Nunez's death "under the immediate influence of sudden passion arising from an adequate cause." The jury assessed Figueroa's punishment at thirty-seven years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his first issue, Figueroa contends that legally and factually insufficient evidence supports the jury's negative finding on the sudden passion special issue.

### A. Standard of Review and Governing Law

At the punishment phase of a murder trial, the defendant may raise whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX. PENAL CODE § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015) ("Sudden passion is a mitigating circumstance that is relevant to determining the appropriate punishment of a defendant."). If the defendant proves this issue "in the affirmative by a preponderance of the evidence," the offense is reduced from a first-degree felony to a second-degree felony. TEX. PENAL CODE § 19.02(d); *Rankin v. State*, 617 S.W.3d 169, 184 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *Moncivais v. State*, 425 S.W.3d 403, 406 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

"Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Neither ordinary anger nor fear alone raises an issue of sudden passion. *Moncivais*, 425 S.W.3d at 407. A defendant may not rely on a cause of his own making—such as precipitating a confrontation—to support his argument that he acted out of sudden passion arising from adequate cause. *Smith v. State*, 355 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

A defendant must prove that the killing occurred "while the passion still existed and before there was reasonable opportunity for the passion to cool." *Moncivais*, 425 S.W.3d at 407; *see McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005); *Herrera v. State*, 513 S.W.3d 223, 228 (Tex. App.—San Antonio 2016, no pet.) ("Sudden passion requires the circumstances be such as to give rise to an immediate influence of sudden passion.") (internal quotations omitted). "Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion." *Moncivais*, 425 S.W.3d at 407. The "core concept" of the sudden

passion defense is that "a person's mental state has rendered him incapable of rational thought and collected action." *Swearingen v. State*, 270 S.W.3d 804, 820 (Tex. App.—Austin 2008, pet. ref'd).

Because sudden passion is an issue on which the defendant bears the burden of proof by a preponderance of the evidence, in reviewing the jury's negative finding on this issue, we apply the legal sufficiency standard of review used in civil cases.[2] *Moncivais*, 425 S.W.3d at 407; *Smith*, 355 S.W.3d at 147–48. We first examine the record for any evidence that supports the jury's negative finding on sudden passion and ignore all evidence to the contrary. *Moncivais*, 425 S.W.3d at 407. If no evidence supports the negative finding, we then examine the entire record to determine whether the evidence establishes the sudden passion issue as a matter of law. *Id.* We

---

[2] Ordinarily, in reviewing the sufficiency of the evidence to support a defendant's conviction, we apply the standard of review set out by the United States Supreme Court in *Jackson v. Virginia*: we view the evidence in the light most favorable to the verdict and determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing 443 U.S. 307, 319 (1979)). This standard does not, however, apply to elements of an affirmative defense that the defendant must prove by a preponderance of the evidence. *Id.* When reviewing a jury's rejection of an affirmative defense, we use the standards of review traditionally used in civil cases, including reviewing a negative finding for factual sufficiency. *Id.* This remains so even though the Court of Criminal Appeals has held that we no longer apply a separate "factual sufficiency" standard when reviewing the sufficiency of the evidence to support a conviction. *See id.* Although sudden passion is a punishment issue, and not a traditional affirmative defense, because the defendant bears the burden to establish sudden passion by a preponderance of the evidence, it is analogous to an affirmative defense in the sufficiency of evidence context. *See Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd).

defer to the factfinder's determination of the weight and credibility of the testimony and evidence admitted at trial. *Id.*

With respect to the factual sufficiency of the evidence, we consider all the evidence neutrally to determine if the negative finding on special passion is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 408; *Smith*, 355 S.W.3d at 148. Again, we may not intrude on the factfinder's role as the sole judge of the weight and credibility of the witnesses' testimony. *Moncivais*, 425 S.W.3d at 409; *Smith*, 355 S.W.3d at 148.

## B. *Whether Sufficient Evidence Supports the Jury's Negative Finding on Sudden Passion*

### 1. Legal Sufficiency of the Evidence

With respect to his legal sufficiency challenge to the jury's negative finding on sudden passion, Figueroa argues that the jury heard evidence that he "was in a constant state of emotional turmoil from the moment he learned of" his wife's affair with Nunez. Figueroa physically assaulted Nunez and fired him, and Figueroa's "emotional state did not improve" between the time of the assault and the time Figueroa returned to the apartment he was temporarily sharing with Nunez. Figueroa argues that, instead of hearing evidence that his "rage had subsided," the jury heard evidence of "his intensifying frustration as he attempted to contact his wife." He therefore argues that no evidence supports the conclusion that he was not acting under the influence of sudden passion when he shot Nunez.

We disagree with Figueroa and conclude that some evidence supports the jury's negative finding on sudden passion. The jury heard evidence that almost immediately after learning of the affair, Figueroa initiated a physical confrontation with Nunez at the construction site, but it did not escalate beyond punching Nunez several times. Instead, Figueroa was able to rein in his anger and feelings of betrayal and order Nunez off the site, thus demonstrating that he was capable of "cool reflection." *See* TEX. PENAL CODE § 19.02(a)(1) (defining "adequate cause" as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection"); *Rankin*, 617 S.W.3d at 185 (concluding that defendant was not "incapable of a cool reflection period" in part because defendant defused argument with complainant before later stabbing him).

Figueroa also had ample "time to deliberate over his actions." *See McKinney*, 179 S.W.3d at 570. Over the course of several hours after the discovery of the affair, he stayed at the construction site and tried to continue working, repeatedly attempted to contact Cabrera and her family members, drove around the area of the site, and drank a six-pack of beer before deciding to purchase a gun. Around this time, approximately three hours after the discovery of the affair and the initial physical confrontation, Figueroa developed the intention to hurt Nunez by shooting him in the genitals. Figueroa thus anticipated a further confrontation with Nunez and

11

prepared for it by purchasing a weapon. *See id.* (concluding that defendant was not entitled to jury instruction on sudden passion in part because defendant returned home after verbal argument with his son, "sat down at his desk for a while and then decided to retrieve his pistol," indicating that he was "preparing himself to respond to the altercation he was anticipating"); *Moncivais*, 425 S.W.3d at 408 ("Anticipation of and preparation for the fight constitutes some evidence that Moncivais had time to deliberate regarding his actions.").

Indeed, Figueroa did more than anticipate a further confrontation with Nunez: he *initiated* the further confrontation by purchasing a gun, entering Nunez's apartment through a window, and shooting Nunez while he was in the shower. Precipitating a confrontation cannot support an argument that a defendant acted out of sudden passion arising from adequate cause. *See Smith*, 355 S.W.3d at 149; *Nance v. State*, 807 S.W.2d 855, 861 (Tex. App.—Corpus Christi–Edinburg 1991, pet. ref'd) (stating that charge on voluntary manslaughter—predecessor to sudden passion special issue—was not required "when a defendant creates the circumstances which instigate the inflaming of that defendant's passions, particularly when a defendant is an aggressor, the precipitator of a confrontation, or [is] attempting to commit a crime when allegedly inflamed by another's response").

To establish the sudden passion defense, a defendant must prove that the killing occurred "while the passion still existed and before there was reasonable

opportunity for the passion to cool." *Moncivais*, 425 S.W.3d at 407. There was some evidence in the record from which the jury could conclude that a "reasonable opportunity" existed "for the passion to cool" and that Figueroa was no longer under the immediate influence of sudden passion at the time he shot Nunez, more than three hours after learning of Nunez and Cabrera's affair. *See id.*; *Herrera*, 513 S.W.3d at 228 ("Sudden passion requires the circumstances be such as to give rise to an *immediate* influence of sudden passion.") (emphasis added).

We conclude that the record contains some evidence to support the jury's negative finding on sudden passion. *See Moncivais*, 425 S.W.3d at 407; *Smith*, 355 S.W.3d at 148. We need not address whether Figueroa proved sudden passion as a matter of law, because that part of the analysis only applies in the absence of any evidence to support the jury's negative finding. *See Moncivais*, 425 S.W.3d at 408. We hold that legally sufficient evidence supports the jury's negative finding on sudden passion. We therefore turn to whether factually sufficient evidence supports the jury's negative finding.

### 2. Factual Sufficiency of the Evidence

With respect to his factual sufficiency challenge, Figueroa argues that his statements during his custodial interview and his testimony at trial provided evidence that he "was so angry and miserable that he was unable to think clearly" and was therefore incapable of cool reflection. He argues that the State did not offer

any contradictory evidence concerning his mental state, nor did the State argue that Figueroa was not "emotionally disturbed" following his discovery of the affair. Figueroa contends that the State—in arguing that the influence of the discovery was not immediate because hours passed between the discovery of the affair and the killing of Nunez—interprets the word "immediate" too narrowly and does not take into account the possibility that Figueroa's anger at Nunez was "rekindled" when he saw Nunez in the apartment.

Figueroa testified that he was sad, angry, disappointed, and "broken" when he learned that Nunez, whom he considered to be family, had been having an affair with Cabrera. He repeatedly testified that he could not think clearly after this discovery and his "mind was wandering" as he tried on numerous occasions to call Cabrera[3] and he thought about what Cabrera and Nunez had done together. He felt manipulated and betrayed by Nunez, who had encouraged Figueroa to have an affair with a woman he met at a bar and then reported Figueroa's infidelity to Cabrera, leading to Figueroa and Cabrera's separation.

After initially confronting Nunez and trying to continue working, Figueroa bought a six-pack of beer at a gas station near the construction site because he "just wanted to make the pain go away" and he did not want to keep thinking about Nunez

---

[3] Cabrera testified that when she spoke to Figueroa after he learned of the affair, he was crying and his emotional state was "different." She agreed that "[i]t hurt him" when she did not return further calls from him.

14

and Cabrera together. When Figueroa then decided to buy a gun, he "didn't feel like [himself]," and he "had many different thoughts in [his] mind, mainly about all the things [Nunez] was telling [Figueroa] he was doing with a female, but all them things he was doing to [Figueroa's] wife." After purchasing the gun, he "just kept driving" and "was not really thinking." He eventually realized that he "was already at [Nunez's] apartment."

Figueroa also testified that he decided to go to Nunez's apartment because he "still wanted to find answers." Figueroa was "sad and mad" at the time, "[b]ut more than anything," he felt "like a joke, because [Nunez] was telling [Figueroa] something, but [Nunez] was doing—he was doing something else." When he was inside Nunez's apartment, Figueroa testified that he "had the gun in [his] hand, but [he] really wanted to stop, but the voices in [his] mind were telling [him] to just keep going." He decided to consume some cocaine that was on Nunez's kitchen counter to "[t]ry to get the strength to walk away." Instead of walking away, however, he searched the apartment for Nunez.

Figueroa stated that he did not have a plan as he searched Nunez's apartment. He also testified that while he did not want to kill Nunez, he did want to hurt Nunez by shooting him in the genitals. Because the shower was running, Figueroa assumed that Nunez was in the shower, and Figueroa fired the gun twice in that direction. The

gunshots hit Nunez, "so [Nunez] got out [of the shower] and tried to hold [Figueroa]." Figueroa testified:

> The bullet woke me up, and I was really scared. I wanted to leave, but [Nunez] would hold me. And I pushed him and he fell. I dropped the gun. I ran. But then I came back for the gun and then he went through the front door and I went through the back door.

Figueroa testified that he regretted his actions, he wished he "could go back in time and change many things," and he missed Nunez and "wish[ed] he would come back."

We conclude that even if the jury credited Figueroa's testimony about the emotional turmoil he experienced after learning of the affair, the jury's negative finding on sudden passion is not so against the great weight and preponderance of the evidence that the finding is manifestly unjust. Figueroa's testimony established the timeline of events after he learned of the affair. Over the course of approximately three-and-a-half hours, Figueroa: had a physical confrontation with Nunez at the construction site, but managed not to escalate the confrontation beyond throwing several punches; fired Nunez and ordered him to leave the site; continued to try to work at the site but kept calling Cabrera and her family members; kept thinking about what Nunez and Cabrera had done together; left the site around two hours after the initial confrontation to drive around; purchased and drank a six-pack of beer; decided to purchase a gun; drove for over an hour to his old neighborhood to purchase the gun; decided to go back to Nunez's apartment with the intent to shoot Nunez in the genitals; consumed cocaine in an attempt to walk away from a further

16

confrontation; and shot Nunez while Nunez was taking a shower. Figueroa thus had time to reflect upon what he had learned and decide upon a course of action. *See Swearingen*, 270 S.W.3d at 820 (noting that "core concept" of sudden passion defense is that "a person's mental state has rendered him incapable of rational thought and collected action").

Figueroa argues that despite the passage of several hours between the discovery of the affair and the shooting of Nunez, he acted under the influence of sudden passion because his anger was "rekindled" upon seeing Nunez in his apartment. However, Figueroa was the one who decided to go to Nunez's apartment several hours after he learned of the affair, physically assaulted Nunez, purchased a gun, and decided that he wanted to hurt Nunez by shooting him in the genitals. *See Moncivais*, 425 S.W.3d at 407 ("Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion.").

After considering all the relevant evidence in a neutral light, we hold that factually sufficient evidence supports the jury's negative finding on the sudden passion special issue. *See id.* at 408; *Smith*, 355 S.W.3d at 148. The jury's negative finding is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Moncivais*, 425 S.W.3d at 408.

We overrule Figueroa's first issue.

**Parole Instruction in Jury Charge**

In his second issue, Figueroa contends that the trial court erred by including surplus language in the punishment-phase jury charge concerning his parole eligibility.

### A. Standard of Review

Code of Criminal Procedure article 36.14 requires the trial court to deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018). When analyzing a claim of jury charge error, our first step is to determine whether error exists. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If there is error in the charge, we must then determine whether the erroneous charge harmed the defendant. *Alcoser*, 663 S.W.3d 165; *Ngo*, 175 S.W.3d at 743.

Our standard of review for jury charge error depends on whether the defendant timely objected to the jury instructions. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). If the defendant timely objected, then we must reverse if the error caused "some harm" to the defendant. *Marshall*, 479 S.W.3d at 843. However, if, as here, the defendant did not timely object, we will reverse "only if the error was so egregious and created such harm that the defendant did not have a fair and impartial trial." *Id.*

18

Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Id.*; *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). In making this determination, we consider: (1) the entirety of the jury charge itself; (2) the state of the evidence, including contested issues and the weight of probative evidence; (3) counsel's arguments; and (4) any other relevant information contained within the trial record. *Marshall*, 479 S.W.3d at 843; *Cosio*, 353 S.W.3d at 777. A determination of egregious harm is fact-specific and is made on a case-by-case basis. *Alcoser*, 663 S.W.3d at 165; *Marshall*, 479 S.W.3d at 843. We examine the relevant portions of the entire record to determine whether the defendant suffered actual harm—as opposed to theoretical harm—due to the error. *Marshall*, 479 S.W.3d at 843; *Cosio*, 353 S.W.3d at 777.

**B.** **Whether Trial Court Erroneously Included Parole Eligibility Language**

Code of Criminal Procedure Article 37.07, section 4, requires the trial court, during the punishment phase of the trial, to give certain jury instructions concerning the law of parole. TEX. CODE CRIM. PROC. art. 37.07, § 4; *Taylor v. State*, 233 S.W.3d 356, 359 (Tex. Crim. App. 2007). In this case, the trial court was required to instruct the jury as follows:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.

19

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.

> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

TEX. CODE CRIM. PROC. art. 37.07, § 4(a); *see Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002) ("Article 37.07, section 4(a) sets out, verbatim, the words that the trial judge is to use."). It is undisputed that the trial court gave this instruction verbatim to the jury in the punishment charge.

The trial court also included the following instruction in the punishment charge:

> You are not to discuss among yourselves how long the accused would be required to serve the sentence that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice and the Governor of the State of Texas, and must not be considered by you.

Figueroa did not object to the inclusion of this instruction in the charge. On appeal, he argues that inclusion of this instruction was erroneous because it deviated from the statutorily prescribed language set out in Article 37.07, section 4(a), and was

impermissible surplusage. He does not argue that this additional instruction misstated the law concerning parole.

We disagree with Figueroa that the trial court erred when it included the additional parole instruction in the punishment charge. Although this instruction was unnecessary, given that the trial court appropriately and correctly gave the jury the instruction required by Article 37.07, section 4(a), nothing contained in the additional parole instruction is erroneous. The first sentence to the additional instruction—"You are not to discuss among yourselves how long the accused would be required to serve the sentence that you impose"—emphasizes the last sentence of the Article 37.07, section 4(a) instruction, which informs the jury that it is not "to consider the manner in which the parole law may be applied to this particular defendant." *See* TEX. CODE CRIM. PROC. art. 37.07, § 4(a).

Similarly, the second sentence of the additional instruction states that "[s]uch matters come within the exclusive jurisdiction of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice and the Governor of the State of Texas, and must not be considered by you." Although it provides slightly more detail concerning who makes parole decisions, this sentence essentially restates the third paragraph of the Article 37.07, section 4(a) instruction, which informs the jury that application of parole law to the defendant "cannot accurately be predicted" because "the application of that law will depend on decisions made by parole

21

authorities." *See id.* We conclude that although the additional parole instruction was unnecessary, it was not erroneous to include this instruction in the punishment charge.[4]

We overrule Figueroa's second issue.

## Conclusion

We affirm the judgmen of the trial court.

April L. Farris
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[4] We note that, as the State points out, courts have held that instructions similar to the additional parole instruction in this case can be "curative" of other errors made in parole instructions. *See Barrueta v. State*, No. 05-12-00639, 2013 WL 3929203, at *5 (Tex. App.—Dallas July 26, 2013, pet. ref'd) (not designated for publication) (stating that substantially similar instruction "did not misstate the law and was not erroneous"); *Grigsby v. State*, 833 S.W.2d 573, 576–77 (Tex. App.—Dallas 1992, pet. ref'd) (stating that courts "have regarded similar instructions as curative and mitigating factors" and that "[t]his curative instruction discourages jurors from imposing greater sentences"). Moreover, this additional instruction informed jurors not to discuss how long Figueroa would be required to serve the sentence imposed because such matters fall within the exclusive jurisdiction of parole authorities. In the absence of evidence to the contrary, we generally presume that jurors follow the trial court's instructions. *See Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011); *see also Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) ("Even if the [jury] note constitutes evidence the jury discussed parole *at a preliminary point*, we presume they followed the court's instructions and thereafter did not consider it in reaching their verdict.").