

# NUMBER 13-22-00597-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ROSE MARIE GARCIA,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                             **Appellee.**

---

### On appeal from the 24th District Court
### of Victoria County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Tijerina, Silva, and Peña
### Memorandum Opinion by Justice Peña

Appellant Rose Marie Garcia appeals her conviction for murder, a first-degree felony.[1] *See* TEX. PENAL CODE ANN. § 19.02(c). Appellant pleaded guilty, and after a

---

[1] Appellant does not appeal her conviction for tampering with physical evidence, a second-degree felony, for which she received a concurrent fifteen-year sentence. *See* TEX. PENAL CODE ANN. § 37.09(c).

punishment trial, the jury assessed a sentence of thirty-eight years' imprisonment. In one issue, appellant argues that the evidence is legally insufficient to support the jury's rejection of her sudden passion defense, which would have reduced the offense to a second-degree felony. We affirm.

## I.     BACKGROUND

A grand jury returned an indictment charging appellant with the murder of Mario Alonzo Garcia Sr., her husband of forty years. Appellant pleaded guilty to the charge, and the case proceeded to a jury trial on punishment, during which the following evidence was adduced.

Appellant reported to the Victoria County Sheriff's Office that her husband Mario[2] was missing. She stated that she last saw Mario eight days prior when he left with a neighbor to travel to Louisiana for work. However, the next day, appellant turned herself in to the Edna Police Department stating that she had killed Mario by shooting him with a shotgun nine days prior in their home in Victoria, Texas. The trial court admitted a recording of her conversation with an Edna police officer into evidence. Appellant tells the officer, "I shot my husband." When asked what provoked her, appellant stated she asked Mario why he could not love her, and Mario responded that he likes to be with other women.[3] After a brief discussion, appellant waited at the Edna Police Department for further questioning by Victoria County Sheriff's deputy Greg Kouba, who was leading the

---

[2] We refer to the deceased by his first name as he shares a surname with appellant and several witnesses.

[3] According to appellant, Mario used more explicit language to make this point, saying "I like to eat pussy, different ones."

investigation into Mario's disappearance.

In her statement to Deputy Kouba, appellant first explained that Mario had engaged in extra-marital affairs throughout their marriage. She stated that a few years ago, she slept with her supervisor at work to get revenge. Regarding the murder, appellant explained that they were in their bedroom around 1:00 or 2:00 a.m., when Mario brought up her prior infidelity. After the two argued for a while, appellant recalled asking Mario why he could not love her like she wanted Mario to love her. Mario replied that he enjoyed being with different women. Appellant stated at that point she picked up a shotgun from the hallway just outside the bedroom, and as Mario turned to face her, she shot him in the face. Mario died instantly. Appellant put a garbage bag over Mario's head to contain the blood. She then dragged his body outside on a blanket to an area covered with brush. Appellant concealed the body with a piece of plywood. Three days later, appellant poured gasoline and carpet freshener near the body to hide the smell of decomposition. When asked if she could explain why she killed Mario, appellant said, "No. I'm not sure."

The day before appellant turned herself in, Mario's son Jaime Garcia called the Victoria County Sheriff's Department and requested that they perform a welfare check on his father. Jaime became suspicious of appellant after he was unable to reach Mario on Father's Day and then receiving conflicting stories from appellant as to Mario's whereabouts. Appellant told Jaime that Mario traveled to Louisiana for work but that he did not bring a phone with him, and she later alleged that he was trafficking cocaine. According to Jaime, Mario was never associated with drugs. Jaime was also concerned because Mario previously told Jaime that appellant threatened to kill Mario and chop off

his head. After making the report to law enforcement, Jaime traveled from his home in Odessa to his parents' home to look for his father. He arrived at the property around the time that appellant was speaking to law enforcement. Jaime walked the fence line of the property, eventually seeing Mario's leg emerging from a pile of debris. He called 9-1-1 to report the discovery. Law enforcement officers discovered a shotgun in a nearby shed. An autopsy confirmed that Mario died from a shotgun wound to the head.

Jaime and brothers Tony and Mario Jr., appellant's adult sons, each described her temperament. All three stated that appellant would beat them when they were children. Jaime said that appellant threatened Mario's life on multiple occasions. Jaime recalled an instance in 2015 when appellant threatened Mario with a handgun. Tony stated that appellant punched him in the face as a child and that she would belittle him. Tony spoke with Mario shortly before his death, and Mario reported that appellant threatened to kill him and chop off his head. Mario Jr. said that appellant has a short fuse. Conversely, Tony described Mario as a quiet, mild-mannered person.

Appellant testified that Mario physically and emotionally abused her throughout their marriage. She maintained that on the morning of the murder, Mario dragged her out of bed by her foot and began complaining about appellant's extra-marital affair years earlier. Appellant recalled that Mario pushed her back onto the bed and began hitting her back and legs with a cell phone cord. She estimated that the incident lasted twenty to thirty minutes. Similar to her law enforcement statements, she recalled asking Mario why he could not love her the way she loved him. She again stated that he responded that he liked to be with different women. Appellant said at that moment she told Mario she was

4

going to the bathroom, but she intended to leave the house through the back door. While leaving, she saw the shotgun in the hallway, picked it up, and shot Mario in the bedroom. Appellant's testimony of how she disposed of the body was consistent with her statements to law enforcement. On cross-examination, she conceded that she never disclosed to law enforcement that Mario physically abused her that night.

The jury found that appellant did not prove by a preponderance of the evidence that she was under the immediate influence of sudden passion arising from adequate cause when she caused Mario's death. It assessed punishment at thirty-eight years' imprisonment. This appeal followed.

## II. STANDARD OF REVIEW & APPLICABLE LAW

At the punishment phase of a murder trial, the defendant may raise whether she caused the death of a person under the immediate influence of sudden passion arising from an adequate cause. *Id.* § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015) ("Sudden passion is a mitigating circumstance that is relevant to determining the appropriate punishment of a defendant."). If the defendant proves this issue "in the affirmative by a preponderance of the evidence," the offense is reduced from a first-degree felony to a second-degree felony. TEX. PENAL CODE ANN. § 19.02(d).

"Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.*

5

§ 19.02(a)(1). Neither ordinary anger nor fear alone raises an issue of sudden passion. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Hernandez v. State*, 127 S.W.3d 206, 213–14 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd)). A defendant may not rely on a cause of her own making to support to support a sudden passion defense. *Smith v. State*, 355 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Naasz v. State*, 974 S.W.2d 418, 420 (Tex. App.—Dallas 1998, pet. ref'd)).

A defendant must prove that the killing occurred "while the passion still existed and before there was reasonable opportunity for the passion to cool." *Moncivais*, 425 S.W.3d at 407 (citing *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005)); *see Herrera v. State*, 513 S.W.3d 223, 228 (Tex. App.—San Antonio 2016, no pet.) ("Sudden passion requires the circumstances be such as to give rise to an immediate influence of sudden passion.") (internal quotations omitted). "Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion." *Moncivais*, 425 S.W.3d at 407. The "core concept" of the sudden passion defense is that "a person's mental state has rendered him incapable of rational thought and collected action." *Swearingen v. State*, 270 S.W.3d 804, 820 (Tex. App.—Austin 2008, pet. ref'd).

Because sudden passion is an issue on which the defendant bears the burden of proof by a preponderance of the evidence, in reviewing the jury's negative finding on this issue, we apply the legal sufficiency standard of review used in civil cases.[4] *Matlock v.*

---

[4] An appellant may also raise a factual sufficiency challenge to the rejection of a sudden passion defense. *See Moncivais v. State*, 425 S.W.3d 403, 408 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

*State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013). We first examine the record for any evidence that supports the jury's negative finding on sudden passion and ignore all evidence to the contrary. *Id*. If no evidence supports the negative finding, we then examine the entire record to determine whether the evidence establishes the sudden passion issue as a matter of law. *Id.* at 669–70. "If the record reveals evidence supporting the [defense], but that evidence was subject to a credibility assessment and was evidence that a reasonable jury was entitled to disbelieve, we will not consider that evidence in our matter-of-law assessment." *Id.* at 670. The defendant must establish that the evidence "conclusively proves his affirmative defense and 'that no reasonable jury was free to think otherwise.'" *Id.* (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)).

## III.   DISCUSSION

Under the first step of our legal sufficiency analysis, we observe that there was evidence supporting the jury's finding that appellant was not acting under the immediate influence of sudden passion arising from an adequate cause. *See id.* at 669. In appellant's statements to law enforcement, she stated that she was provoked only by Mario's statement that he liked to be with multiple women. The jury could have reasonably disregarded her contradictory trial testimony that Mario had physically and emotionally abused her for years and had physically assaulted her in the moments preceding the murder. *See id.* at 670. This credibility determination is further supported by testimony that appellant was ill-tempered, abused her children, and had previously threatened to kill

---

Appellant does not bring such a challenge in this case.

Mario with a firearm and by chopping off his head. *See id.*; *see also Alvarado v. State*, No. 05-21-01026-CR, 2023 WL 4446338, at *4 (Tex. App.—Dallas July 11, 2023, no pet. h.) (mem. op., not designated for publication) ("[T]he jury could have . . . reasonably believed Alvarado was an aggressive and violent individual and could have reasonably disbelieved much of Alvarado's version of the events.").

Further, however crass, Mario's statement that he liked to be with other women is not an adequate cause for a sudden passion defense, especially in light of appellant's testimony that she was aware of Mario's infidelities throughout their forty-year marriage. *See* TEX. PENAL CODE ANN. § 19.02(a)(2); *Nance v. State*, 807 S.W.2d 855, 861 (Tex. App.—Corpus Christi–Edinburg 1991, pet. ref'd) ("Passion solely the result of former provocation is insufficient."); *see also Castellano v. State*, No. 01-14-00486-CR, 2015 WL 3981807, at *3 (Tex. App.—Houston [1st Dist.] June 30, 2015, no pet.) (mem. op., not designated for publication) (concluding that legally sufficient evidence supported the jury's rejection of sudden passion where the defendant had past arguments with the victim, had previously been assaulted by the victim, and "lost it" in an argument that led to the defendant killing the victim).

Because we have concluded that some evidence supports the jury's rejection of appellant's sudden passion defense, we need not determine whether the evidence establishes the sudden passion issue as a matter of law. *See Matlock*, 392 S.W.3d at 670. We conclude the jury's negative finding is supported by legally sufficient evidence. *See id.* at 669. We overrule appellant's sole issue.

8

## IV.    CONCLUSION

We affirm the trial court's judgment.

L. ARON PEÑA JR.
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
28th day of August, 2023.