**Opinion issued August 1, 2023.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00267-CR

_____

**DINESHA RENEE JACKSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 208th District Court
Harris County, Texas
Trial Court Case No. 1650785

## MEMORANDUM OPINION

Kaila Nelson ("Nelson") robbed 20-year-old Dequan Anderson ("Anderson") as he left the Dollar General store where he worked. During the course of the robbery, Nelson fatally shot Anderson. The State charged Appellant Dinesha Renee Jackson with capital murder. During the trial, the State argued Appellant had

conspired with Nelson to commit robbery. The State explained to the jury that it convict Appellant of capital murder as a principal or as party to the offense under the law of parties.[1] The jury found Appellant guilty of capital murder and the trial court assessed her punishment at confinement for life with no possibility of parole. This appeal followed.

In one issue, Appellant argues there is insufficient evidence to sustain her conviction for capital murder because the evidence did not establish she conspired to commit robbery or that she could have foreseen capital murder would result from carrying out the conspiracy. We affirm the trial court's judgment.

## Background

On December 17, 2017, Anderson left the Dollar General store where he worked to make a "money run" bank deposit of approximately $3,000. As Anderson was getting into his car with the deposit bag, Nelson ran up and attempted to take the bag from Anderson. Anderson resisted and managed to keep control of the bag. As Anderson attempted to reverse out of his parking spot, Nelson fired several gun shots in his direction hitting Anderson four times. Anderson's car came to a stop.

---

[1] Jackson was charged by indictment with capital murder. The jury charge authorized the jury to convict Jackson of capital murder (1) as a principal or (2) as a party to the offense under the law of the parties pursuant to Section 7.02(a)(2) or Section 7.02(b) of the Texas Penal Code. *See* TEX. PENAL CODE § 7.01, 7.02(a)(2), 7.02(b); *see also In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) ("Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence.").

Nelson smashed the driver's window, took the money bag, and ran. Anderson was taken by ambulance to the hospital where he later died from the gunshot wounds. The State charged Appellant Dinesha Renee Jackson ("Jackson"), an Assistant Manager at the Dollar General store where Anderson worked, with capital murder. At trial, the State alleged Jackson conspired with Nelson to rob Anderson.[2]

**Testimony at Trial**

### A. Deunita Meeks

Deunita Meeks ("Meeks") testified that in December 2017, she worked as an Assistant Manager at the Dollar General store, together with Jackson and Anderson. According to Meeks, she, Jackson, and Anderson were all authorized to make bank deposits for the store. Meeks explained that during the December holiday season, the store makes a midday bank run to deposit money from the morning and the night before. Meeks testified that the employee who makes the bank deposit generally logs the money out of the safe, counts the money, signs and prepares the bank deposit slip, and seals the money in a clear bag. If the night deposit is involved, the employee puts the money back in the safe for deposit the next day. Otherwise, the employee puts the money bag in another bag and takes it to the bank. Meeks testified

---

[2] Nelson was convicted of capital murder and the trial court assessed her punishment at confinement for life with no possibility of parole. *See Nelson v. State*, No. 14-20-00258-CR, 2021 WL 4956990, at *1 (Tex. App.—Houston [14th Dist.] Oct. 26, 2021, no pet.). The Fourteenth Court of Appeals affirmed Nelson's conviction. *See id.* at *5.

that Dollar General trains its employees to not resist if someone attempts to rob the store.

Apart from being coworkers, Meeks and Jackson were also friends and they lived in the same apartment complex near the Dollar General store. According to Meeks, two women had been staying with Jackson at her apartment for about a week before the shooting. She identified the two women as Jamesha Robinson ("Robinson") and her girlfriend Nelson. Meeks testified that Robinson is Jackson's friend. Meeks associated with Robinson, but she only met Nelson once. During the time Robinson and Nelson stayed at Jackson's apartment, Jackson borrowed Meeks' car to take Nelson to look for a job.

Meeks and Jackson were working the morning shift at the Dollar General the day of the shooting. Meeks testified that she and Jackson were discussing who would make the midday bank deposit. When Meeks offered to go, Jackson told her Anderson would go instead because it was his responsibility. Anderson was scheduled to arrive for his shift at 1 p.m. Although she knew Anderson would be making the midday bank deposit, Jackson prepared the deposit at 12:30 p.m. and she signed for it using her own name.

Jackson was "on her phone" standing near the store's front window watching the parking lot when Anderson arrived and parked his car in front of the store. Anderson, who arrived at work at 1:00 p.m., had only been in the store a few minutes

4

when Jackson instructed him to make the money run to the bank. According to Meeks, Anderson was upset because Jackson had already prepared the deposit and put her name on it, and he had not had a chance to verify the deposit information. Meeks, who was standing next to Jackson, testified she saw Anderson exit the Dollar General store with the money bag Jackson prepared. As Anderson was getting into his car, Meeks testified she saw Nelson run up to Anderson. Nelson tried to grab the money bag from Anderson, but Anderson resisted, and a tussle ensued. After wrestling the money bag from Nelson, Anderson closed his car door and tried to drive away. According to Meeks, Nelson ran away and then returned momentarily with a gun in her hand. Nelson shot at Anderson's car four or five times before Anderson crashed the car in the street. After the crash, Nelson ran over to Anderson's car. She broke the driver's side window, grabbed the deposit bag, and ran back to a getaway car.

Meeks testified that when she saw what happened, she exited the Dollar Store and ran over to Anderson's car to check on him. Meeks and several Dollar General customers called 911 to report the shooting. Jackson, who Meeks testified was standing next to her when the robbery and shooting occurred and was the Assistant Manager on duty, stayed inside the store. She did not check on Anderson or call 911.

## B. Robinson

Robinson was granted immunity by the State. She testified that she and Jackson met in in 2007 when they were in the 7th grade and living in Atlanta, Georgia. According to Robinson, she and Jackson were close friends and they continued to be close even after Jackson moved to Houston, Texas a year or two before the shooting.

Robinson met her girlfriend Nelson in high school, but they did not begin to date until 2016. By 2017, Robinson and Nelson were both addicted to heroin. According to Robinson, Nelson paid for the heroin when she was working, but they otherwise had to borrow money from Nelson's grandmother or friends to support their $200 a day heroin addiction. When asked if Nelson had a "hot temper," Robinson testified that Nelson would get irritated and agitated when she was high on heroin.

In September 2017, Robinson and Nelson were living with Robinson's sister at an apartment complex in Atlanta, Georgia. Robinson testified that one day, after she and Nelson argued, Nelson locked herself in the bedroom and threatened to kill herself. Robinson, who knew Nelson had a gun, heard gunfire and called the police. When Robinson broke into the bedroom, she noticed that Nelson had only fired the weapon at the window. Nelson was arrested and the police seized her gun.

As a result of the incident, Nelson and Robinson were forced to move out of Robinson's sister's apartment. Nelson and Robinson, who were both unemployed, first stayed with friends or lived out of Robinson's car. Later, in December 2019, Robinson called Jackson to ask for help. Jackson offered to let her stay with her at her apartment in Houston. Nelson and Robinson, who arrived in Houston at least a week before the shooting, stayed with Jackson at her apartment. Robinson testified that she told Jackson about Nelson's gun incident before she and Nelson came to Houston.

After they arrived in Houston, Robinson told Jackson that she and Nelson were addicted to drugs. According to Robinson, Nelson purchased heroin when they were staying with Jackson and Nelson would smoke the heroin inside Jackson's apartment. Robinson and Nelson looked for work in Houston without success. According to Robinson, Nelson's grandmother sent Nelson money while they were in Houston. Nelson used the money to pay for her and Robinson's $200 per day heroin addiction, and Nelson was "desperate to get money" after spending her grandmother's money.

Robinson testified that she never saw Nelson with a gun when they were in Houston. She also testified that Jackson was not a violent person and that she had never seen Jackson with a gun. Robinson testified that Nelson did not tell her how she was planning to get money to pay for their heroin addiction after they spent

Nelson's grandmother's money, and she never heard Jackson and Nelson discuss a plan to rob the Dollar General store.

Robinson testified that Nelson paid Kevin Berry ("Berry"), a private Uber driver Nelson met on Craigslist, to drive them around in Houston.[3] Nelson called Berry the morning of Anderson's murder and arranged for Berry to drive her and Robinson to the Dollar General store. Berry picked up Robinson and Nelson from Jackson's apartment complex and drove them to the Dollar General store. When they arrived, Berry parked the car down the street from the store. Nelson got out and Berry and Robinson waited for her in the car. After a few minutes, Robinson heard gunshots and then Nelson ran up to the car and told Berry, "Drive, drive." According to Robinson, Nelson had a "Dollar General bag" filled with cash when she got back in the car. Berry drove the women back to Jackson's apartment and then to the Greyhound bus station where the couple caught a bus back to Georgia. They stopped on the way to the bus station, however, for Nelson and Robinson to

---

[3] Berry, who was also granted immunity by the State, testified that he drove Nelson and Robinson to Walmart three days before the shooting to pick up money. The next day, Berry drove Nelson and Robinson to buy drugs. According to Berry, they did not pay him for that trip. Berry testified that Nelson was wearing a gun both days. Nelson contacted Berry and arranged for him to pick her and Robinson up at Jackson's apartment the day of the shooting. Nelson told Berry that she needed to be somewhere by 12:30 p.m. According to Berry, Nelson threw $200 in cash at him when she got back in the car. Berry testified that he never met Jackson.

buy heroin. According to Robinson, Nelson paid for the heroin with the cash she had just taken from Anderson.

## C. Detective Matthew Brady

Detective Matthew Brady ("Detective Brady"), a homicide detective with the Houston Police Department, was assigned to investigate Anderson's death. He testified at trial that Jackson spent several hours after the shooting reviewing surveillance videos with police officers at the scene. He testified that Jackson directed the officers to customers who had been in the store prior to the shooting as possible suspects.

Detective Brady and his partner, Detective Michael Casso ("Detective Casso"), interviewed Jackson twice as part of the investigation.

### 1. Jackson's First Interview

Detective Brady and Detective Casso first interviewed Jackson on January 30, 2018—about one month after the incident. The video recording of Jackson's interview, marked as State Exhibit 170, was admitted into evidence and played for the jury.

Detective Brady testified that Jackson "lied consistently [during the interview] until [the detectives] confronted her with some evidence, and then she would adjust her statement." Jackson first told the Detectives she was using her mother's cell phone the day of the shooting because she did not have a phone and that she gave

9

the police her mother's phone number when she was questioned by police at the scene. She later admitted that she had been using her own cell phone and gave police the wrong phone number the day of the shooting. Jackson also told the Detectives that she threw her cell phone into a lake on the day of the shooting. She stated she wanted no one to find her text messages with Nelson and that she bought a new phone with a new phone number.

Jackson told the Detectives that no one was staying with her at her apartment the day of the shooting. Later, when confronted with pictures of Robinson, she admitted Robinson was a friend who stayed with her at her apartment a few days. But Jackson claimed that Robinson had returned to Georgia a few days before the shooting. At first, Jackson also denied knowing Nelson and acted surprised when Detective Brady showed her a photograph of Nelson. Jackson admitted she recognized Nelson in the picture, but she claimed that Robinson had traveled from Georgia alone and had met Nelson in Houston. Jackson repeatedly denied that Nelson had stayed at her apartment. She claimed Nelson never stayed with her and only came to Jackson's apartment while Robinson was there. Jackson eventually came clean with the Detectives and admitted that Nelson and Robinson both traveled from Georgia together and stayed at her apartment for four days.

Jackson also denied knowing anything about the robbery. She acted surprised or feigned ignorance when the Detectives shared some of the facts they discovered

10

during their investigation, including the fact Robinson had been in the getaway car with Nelson on the day of the shooting. The Detectives told Jackson they believed the robbery was an "inside job" and that she was involved. They explained to Jackson that they had been able to trace the robbery back to her based on her relationship with Robinson.

Jackson claimed she knew nothing about Nelson's plan to rob the Dollar General store. She denied "setting up" the robbery or telling Nelson or Robinson anything about the money drop. The Detectives asked for the truth, but Jackson continued to deny any involvement in the incident. It was not until the Detectives confronted her with other facts, including the fact Robinson and Nelson had both been picked up from her apartment in the getaway car shortly before the robbery and dropped off at her apartment after, that Jackson admitted some knowledge of the robbery.

According to Jackson, the robbery was Nelson's idea. Even though she admitted telling Nelson who would be working the day of the shooting and giving Nelson a description of everyone who worked at the Dollar General store, including Anderson, Jackson claimed Nelson had figured out the rest on her own. She denied alerting Nelson when Anderson left the store or telling Nelson how much money Anderson was carrying with him.

When asked how her conversation with Nelson started, Jackson told the Detectives that two days before the shooting, Nelson told her she needed money and wanted to get a job. Jackson told her manager at the Dollar General store that Nelson was looking for a job, but the store was not hiring. According to Jackson, Nelson said she "needed to go do something crazy," which Jackson understood to mean Nelson was going to "get some money." According to Jackson, Nelson asked her about the other employees at the Dollar General store, and she wanted to know "how the money worked." Jackson admitted telling Nelson "everything," including when employees make the store's bank deposits and that Anderson would be making the bank run around 1 p.m. the day of the shooting. She also admitted she gave Nelson a physical description of Anderson and texted Nelson as Anderson was leaving the store to make the deposit. Jackson also told the Detectives she sent Nelson a picture of a different money bag employees at the store had previously deposited. Jackson claimed no one ever suggested that Nelson steal the money from Jackson, as opposed to another Dollar General employee, when making a money run.

Although she claimed that Nelson never stated she was planning to rob someone, Jackson later admitted she knew Nelson was coming to the Dollar General store to get the money. Jackson told the Detectives that Nelson was just supposed to take the money from Anderson and run. She claimed Nelson was not supposed to pull out a gun and she claimed she did not believe Nelson was the type of person

12

who would shoot someone. When asked if Anderson was a passive guy, Jackson said she did not know. Jackson told the Detectives that the store's policy is to hand over the money in the event of a robbery, but she denied telling Nelson about the policy. Jackson at first denied receiving any money from the robbery. She later admitted that Nelson left $500 for her at her apartment, but she claimed she got rid of the "blood money" and never spent it.

Despite repeatedly claiming she had never seen Nelson with a gun, Jackson later admitted she knew Nelson had a gun, and that Nelson "always" had the gun with her. Jackson admitted she once saw part of the gun when Nelson was wearing the gun on her hip, but the gun was mostly covered by Nelson's shirt. Jackson told the Detectives she eventually left the store to go outside after the shooting, and that she called her manager to report the incident.

### 2. Jackson's Second Interview

Detective Brady and Detective Casso interviewed Jackson again on February 14, 2018. They did so after interviewing Robinson and Nelson, who had been arrested in Georgia for Anderson's murder. A video recording of Jackson's second interview, marked as State Exhibit 171, was admitted into evidence and played for the jury.

Jackson, who was arrested at the beginning of the interview, waived her *Miranda*[4] rights and spoke with the Detectives. Jackson told Detective Brady and Detective Casso that Nelson first suggested taking the money from Jackson when Jackson was making a bank deposit, but Jackson decided that another store employee should make the deposit instead because Jackson did not want to "get in trouble" with Dollar General. Jackson also claimed she told Nelson that Dollar General instructs its employees not to resist during a robbery.

Jackson admitted texting Nelson when Anderson arrived at the store and as he was leaving the store with the money bag. Jackson admitted that Nelson wore a gun on her hip and that she had seen Nelson with the gun before the robbery. Jackson told the Detectives that she "didn't know that [Nelson] was going to bring the gun. . . I probably would have thought that she would have carried it, but I didn't think she would have brought the gun." When asked if she assumed Nelson would bring the gun with her to the robbery, Jackson stated, "I didn't know but yeah, it's like common sense like she was probably going to bring it." Jackson stated that Nelson "always" had the gun with her, and she never left it at the apartment because "she always had it." Jackson told the Detectives that her role was to provide Nelson with information about the store and the bank run, but the rest was up to Nelson. She claimed she did not ask Nelson if she planned to use the gun during the robbery.

---

4      *Miranda v. Arizona*, 384 U.S. 436 (1966).

14

Jackson also admitted she knew Nelson used heroin and crack. While she never saw Nelson do drugs, Jackson stated she knew Nelson and Robinson used drugs at her apartment because she could smell "a burnt smell" in her restroom. Jackson told the Detectives she helped Nelson look for employment in Houston and that Nelson "needed money" and was "desperate for crack."[5] Jackson also told the Detectives she got rid of everything. She threw her cell phone and the money Nelson left behind for her in a lake because she was scared and she "didn't want nobody to know."

## D.    The Indictment and Jury Charge

The State charged Jackson with capital murder.[6] The jury charge authorized the jury to convict Jackson of capital murder (1) as the principal or (2) as a party to the offense under the law of parties pursuant to Section 7.02(a)(2) or Section 7.02(b) of the Texas Penal Code. *See* TEX. PENAL CODE § 7.01, 7.02(a)(2), 7.02(b). The jury also was authorized to convict Jackson of one of the lesser-included offenses of felony murder, aggravated robbery, or robbery under these same theories of criminal liability. *See id.* The jury convicted Jackson of capital murder and the trial court

---

[5]    Jackson also admitted that her boyfriend, who is incarcerated, spoke to Robinson to discuss what to do after the robbery. Jackson told the Detectives she gave her boyfriend Robinson's number.

[6]    Detective Brady testified that Jackson was initially charged with aggravated robbery, but the State later upgraded the charge to capital murder.

15

assessed her punishment at confinement for life with no possibility of parole. This appeal followed.

## Sufficiency of the Evidence

In one issue, Jackson argues the evidence is insufficient to support her conviction for capital murder because there is insufficient evidence (1) she conspired with Nelson to commit robbery, or (2) that she should have foreseen capital murder would result from carrying out the conspiracy to commit robbery. *See* TEX. PENAL CODE § 7.02(b). According to Jackson, the evidence shows that, at most, she conspired with Nelson to commit theft. Jackson further argues there is insufficient evidence she should have foreseen capital murder would result from carrying out the conspiracy because Jackson is not a violent person, she did not encourage Nelson to use violence, she did not know Nelson would use a gun, and she did not expect for Anderson to resist Nelson's efforts to take the money from him because Dollar General employees are trained to hand over the money upon demand and to not resist.

The State argues the evidence is sufficient to support Jackson's conviction for capital murder because there is evidence Jackson and Nelson conspired to steal the money from Anderson, Jackson knew Nelson "always" carried a gun with her, and Jackson admitted it was "common sense" to bring a gun to a robbery.

16

## A.      Standard of Review

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).  We examine all evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

As the trier of fact, the jury is the sole judge of the weight and credibility of the evidence.  *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018).  As the sole judge of credibility, the jury may accept one version of the facts and reject another, and it may reject any part of a witness' testimony.  *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  We defer to the jury to resolve fairly any "conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).  A reviewing court, faced with a record of historical facts supporting conflicting inferences, must presume the

17

factfinder resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326.

## B. The Indictment and the Jury Charge

The State charged Jackson with capital murder. The indictment states:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, DINESHA RENEE JACKSON, hereafter styled the Defendant, heretofore on or about December 17, 2017, did then and there unlawfully, while in the course of committing and attempting to commit the robbery of Dequan Anderson, intentionally cause the death of Dequan Anderson by shooting the Complainant with a Deadly Weapon, namely a firearm.

Although the indictment alleges that Jackson was the principal actor in the capital murder, the charge authorized the jury to convict Jackson of capital murder as a principal actor or as a party to the offense under the law of parties pursuant to Section 7.02(a)(2) or Section 7.02(b) of the Texas Penal Code. *See* TEX. PENAL CODE § 7.02(a)(2), (b). The charge provides:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 17th day of December, 2017, in Harris County, Texas, the defendant, Dinesha Renee Jackson, did then and there unlawfully, while in the course of committing or attempting to commit the robbery of Dequan Anderson, intentionally cause the death of Dequan Anderson by shooting Dequan Anderson with a deadly weapon, namely a firearm; or

> If you find from the evidence beyond a reasonable doubt that on or about the 17th day of December, 2017, in Harris County, Texas, Kayla [sic] Nelson, did then and there unlawfully, while in the course of committing or attempting to commit the robbery of Dequan Anderson, intentionally cause the death of Dequan Anderson by

18

shooting Dequan Anderson with a deadly weapon, namely a firearm, and that the defendant, Dinesha Renee Jackson, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Kaila Nelson to commit the offense, if she did;[7] or

If you find from the evidence beyond a reasonable doubt that on or about the 17th day of December, 2017, in Harris County, Texas, in the attempt to carry out a conspiracy to commit the felony of robbery, the felony of capital murder is committed by Kayla [sic] Nelson and the defendant, Dinesha Renee Jackson, though having no intent to commit the offense of capital murder, but in furtherance of the unlawful purpose should have anticipated the offense of capital murder would be committed as a result of carrying out the conspiracy, then you will find the defendant guilty of capital murder, as charged in the indictment.[8]

## C.     Applicable Law

A person commits capital murder if she "intentionally or knowingly causes the death of an individual" and "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat."  TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(2).   A person commits robbery "if, in the course of

---

[7]     *See* TEX. PENAL CODE § 7.02(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.").

[8]     *See* TEX. PENAL CODE § 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.").

committing theft. . . and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."[9] *Id.* § 29.02(a). "A person commits criminal conspiracy if, with intent that a felony be committed:

> (1)    he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and

> (2)    he or one or more of them performs an overt act in pursuance of the agreement.

TEX. PENAL CODE § 15.02(a). "An agreement constituting a conspiracy may be inferred from acts of the parties." *Id.* § 15.02(b); *see also Rivas v. State*, 473 S.W.3d 877, 886 (Tex. App.—San Antonio 2015, pet. ref'd) (stating "direct evidence of an agreement among conspirators is not required and rarely exists"); *see also Eggert v. State*, No. 11-05-00227-CR, 2007 WL 1644061, at *1 (Tex. App.—Eastland June 7, 2007, pet. ref'd) (not designated for publication) (noting that because conspirators' work is clandestine in nature, circumstantial evidence is sufficient to support conviction) (citing *Butler v. State*, 758 S.W.2d 856, 860 (Tex. App.—Houston [14th Dist.] 1988, no pet.)).

---

[9]    A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. TEX. PENAL CODE § 31.03(a). The offense is a state jail felony if "the property is stolen from the person of another." *Id.* § 31.03(e)(4)(B).

A person may be convicted as a party to an offense, including capital murder, "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE § 7.01(a); *see Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). The law of parties, set forth under Section 7.02 of the Texas Penal Code, may be applied to a case even though no such allegation is contained in the indictment. *See In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) ("Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence."); *see also Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002) ("It is well-settled that the law of parties need not be pled in the indictment.").

Under Section 7.02(a)(2) of the Texas Penal Code, a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE § 7.02(a)(2). And under Section 7.02(b), a person is criminally responsible for an offense committed by another under a theory of conspiracy. That section provides:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).

21

When determining whether a person is a party to an offense, courts "may look to 'events before, during, and after the commission of the offense.'" *Gross*, 380 S.W.3d at 186 (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). Circumstantial evidence is sufficient to prove a defendant's status as a party, but "[t]here must be sufficient evidence of an understanding and common design to commit the offense." *Id.* (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). "Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts [is] sufficient to support the conviction under the law of parties." *Id.*

## D.      Analysis

Jackson argues there is insufficient evidence she conspired with Nelson to commit robbery because although she and Nelson agreed that Nelson would steal the money bag from Anderson, Jackson and Nelson "never discussed that the theft would involve a weapon, and Jackson told the detectives that no one was supposed to get hurt." Jackson further argues that even if she conspired with Nelson to commit robbery, there is insufficient evidence she should have foreseen that capital murder would result from Nelson carrying out their conspiracy. She argues there is no evidence Jackson "encouraged the use of violence" when she and Nelson planned the robbery, Jackson has no history of violence, Jackson knew Dollar General

22

employees are trained not to resist a robber's demands to hand over money, and Jackson did not know Nelson would use a gun during the commission of the robbery.

## 1. Evidence of Conspiracy to Commit Robbery

The evidence, when viewed in the light most favorable to the jury's verdict, establishes that Jackson gave Nelson all the information she needed to carry out the robbery, including the time, the place, and the description of the intended victim, Anderson. After repeatedly denying that she even knew Nelson, Jackson eventually admitted that she had explained to Nelson how Dollar General handles its daily bank deposits and that she gave Nelson a description of everyone who worked at the store, including Anderson. Jackson, who decided that Anderson would make the midday bank run, told Nelson that Anderson was scheduled to arrive at work at 1 p.m., and she texted Nelson when Anderson arrived at work and when he left the store to go the bank.

Jackson knew that Nelson was an unemployed heroin addict who needed money to pay for her expensive addiction. Jackson admitted that Nelson used drugs at her apartment because she could smell "a burnt smell" in her restroom. And as she told Detective Brady and Detective Casso, Nelson "needed money" and was "desperate for crack." Jackson also admitted she had seen Nelson with a gun, and she knew that Nelson always wore a gun on her hip and never left it behind. Jackson also knew Robinson had used the gun before and had been arrested in Georgia for

discharging the gun in Robinson's sister's apartment. Robinson testified she told Jackson about the gun incident in Georgia, and she also testified that Nelson would get agitated when high on drugs. A jury could reasonably infer from this evidence that Nelson had a propensity for violence.

Although she denied knowing that Nelson was planning to bring the gun to the robbery, Jackson admitted to Detective Brady and Detective Casso that she "probably would have thought that [Nelson] would have carried [the gun]." When asked if she had assumed that Nelson was going to bring the gun with her to the robbery, Jackson stated, "I didn't know but yeah, it's like common sense she was probably going to bring it." Jackson stated that Nelson "always" had the gun with her, and she never left it at the apartment because "she always had it." The jury could have reasonably inferred from this evidence that Jackson knew Nelson would bring the gun with her to the robbery. *See Hooper*, 214 S.W.3d at 13 (stating jury is entitled to draw reasonable inferences from basic facts to ultimate facts).

After setting the wheels in motion, Jackson stood back and watched from the store window as Nelson ran up to Anderson's car and, after failing to wrestle the money away from Anderson, shot at Anderson's car as he attempted to drive away. Jackson, who did nothing to stop Nelson, stayed inside the store after the shooting and called the store manager. Unlike Meeks, Jackson never called 911 for help or attempted to render aid to Anderson.

24

Jackson also tried to destroy evidence by throwing her cell phone and the $500 Nelson left for her at her apartment into a lake later that night. She also misled officers at the scene by giving them a fake cell phone number and spending hours reviewing surveillance videos with officers at the scene directing them to customers who had been in the store prior to the shooting as possible suspects. Jackson was also less than forthcoming when she was first interviewed by Detective Brady and Detective Casso, repeatedly changing her story when confronted with evidence that refuted her claims. And even during her second interview, Jackson was less then forthcoming, offering new information or facts only after being pressed for more information from Detective Brady and Detective Casso.

A jury reasonably could conclude from all of this evidence that Jackson conspired with Nelson to rob Anderson. *See* TEX. PENAL CODE § 15.02(b) ("An agreement constituting a conspiracy may be inferred from acts of the parties."); *see also Hooper*, 214 S.W.3d at 13 (stating jury is entitled to draw reasonable inferences from basic facts to ultimate facts). Although Jackson told Detective Brady and Detective Casso that the plan was for Nelson to simply grab the money from Anderson and run, and that no one was supposed to get hurt, as the sole fact finder, it was the jury's role to assess the weight and credibility of the evidence and resolve any conflicts in the evidence and the jury apparently did not find Jackson's statements credible. *See Jackson*, 443 U.S. at 326. As the reviewing court, we must

25

defer to the jury's resolution of this issue. *See id.*; *see also Ervin v. State*, 333 S.W.3d 187, 201 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (holding evidence sufficient to prove defendant conspired to commit robbery because defendant drove alleged co-conspirators to carwash, co-conspirators had guns and were wearing bandana masks and hoodies, defendant knew co-conspirators were going to rob man washing his car, and defendant picked up co-conspirators from carwash after robbery); *Nunez v. State*, 215 S.W.3d 537, 541 (Tex. App.—Waco 2007, pet. ref'd) (holding evidence sufficient to prove defendant conspired to rob restaurant because defendant hid in bushes near restaurant late at night wearing dark clothes and ski cap, fled from scene, took same path of escape as alleged co-conspirator, and gun and ski cap were found near bushes); *Hanson v. State*, 55 S.W.3d 681, 690 (Tex. App.—Austin 2001, pet. ref'd) (holding evidence sufficient to prove robbery conspiracy when defendant knew about plan to rob victim at victim's home by hitting victim over his head, went with alleged co-conspirators to victim's home, carried hammer used in attack in his knapsack, and afterwards retrieved hammer and washed knife used by co-conspirators to attack victim); *Thompson v. State*, 54 S.W.3d 88, 95 (Tex. App.—Tyler 2001, pet. ref'd) (holding evidence sufficient to prove robbery conspiracy because defendant knew of plan to rob two men, defendant participated in plan, and noting lack of evidence "that any member of the group did anything but cooperate with the terms of the plan to commit robbery").

26

## 2. Evidence of Murder as a Foreseeable Result

Based on this same evidence, a jury also reasonably could conclude that Jackson should have foreseen the possibility of murder occurring during the course of the robbery given that Nelson was an unemployed heroin addict with a propensity for violence who was desperate for money and always carried a gun with her. *See Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery."); *see also Ervin*, 333 S.W.3d at 201–02 (holding murder was anticipated result when defendant participated in robbery conspiracy and knew co-conspirators were armed). While Jackson told the Detectives she did not know Nelson was going to bring the gun with her to the robbery or think that Nelson would bring it with her, it was the jury's exclusive role to assess the weight and credibility of the evidence and resolve any conflicts in the evidence. *See Jackson*, 443 U.S. at 326. As the reviewing court, we must presume the jury resolved any conflicts in favor of the prosecution and we defer to the jury's resolution. *See id*.

Jackson argues this case is distinguishable from our prior opinion in *Love v. State*, 199 S.W.3d 447 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). In *Love*, the defendant, who worked as a night manager for Whataburger, recognized one of

the men in a car that pulled up to the drive-through window, and he went outside to speak to him. *Id.* at 449. The defendant told that man, his co-conspirator, that he should return to the restaurant to commit a robbery on a night when the defendant worked, and they would pretend not to know one another, and the defendant would give him the money. *Id.* The defendant told his co-conspirator that if someone else was working that night, he should not believe any employee who told him he did not have keys to the restaurant's safe or know how to open the safe because that employee could open the safe. *Id.*

When the defendant came back inside the store, he told his co-workers that the men he had been talking to outside had guns and were attempting to rob someone at the restaurant, but that the defendant knew one of the men and was able to convince them not to rob anyone. *Id.* The defendant told everyone to be careful in case the men attempted to rob someone at the restaurant again. *Id.* at 449–50. The defendant, who left work early the night of the robbery, left an intellectually disabled co-worker in charge of the restaurant. *Id.* at 450. The co-worker was shot and killed when he refused to provide the keys to the safe to the co-conspirator. *Id.* at 451.

On appeal, this Court held there was sufficient evidence the defendant should have anticipated there was a possibility one of his co-conspirators would commit murder during the course of the robbery he helped plan. *Id.* at 453–54. Jackson argues there is insufficient evidence she should have anticipated the possibility

28

Nelson would commit murder during the course of the robbery because unlike the defendant in *Love*, she did nothing to increase the chance of force or violence being used in the robbery, and she did not know that Nelson would use a gun during the robbery. On the contrary, the jury reasonably could have inferred that Jackson knew Nelson would bring the gun with her to the robbery because Jackson knew Nelson always carried a gun with her, she "probably would have thought that [Nelson] would have carried [the gun]" to the robbery, and she admitted it was "like common sense [Nelson] was probably going to bring it" to the robbery. *See Hooper*, 214 S.W.3d at 13 (stating jury is entitled to draw reasonable inferences from basic facts to ultimate facts). Although Jackson may not have done anything to increase the likelihood Nelson would use force or violence to accomplish the robbery, such conduct is not required to establish criminal liability under the law of the parties, nor is the absence of such evidence dispositive in a sufficiency of evidence inquiry. *See Jackson*, 443 U.S. at 319 (stating courts examine all evidence in light most favorable to jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

We thus hold there is sufficient evidence supporting the jury's finding that Jackson conspired with Nelson to commit robbery, and that Jackson, who knew that Nelson always had her gun with her and never left it behind, should have foreseen

the possibility of murder occurring during Nelson's efforts to carry out their conspiracy to rob Anderson.

We overrule Jackson's challenge to the sufficiency of the evidence supporting her conviction for capital murder.

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Goodman, Landau, and Rivas-Molloy.

Do Not Publish.   TEX. R. APP. P. 47.2(b).